People v Jimenez (2016 NY Slip Op 05620)





People v Jimenez


2016 NY Slip Op 05620


Decided on July 21, 2016


Appellate Division, First Department


Mazzarelli, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on July 21, 2016
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Angela M. Mazzarelli, J.P.
Rolando T. Acosta
Karla Moskowitz
Rosalyn H. Richter, JJ.


3825/06 16434 

[*1]The People of the State of New York, Respondent,
v
Ricardo Jimenez, Defendant-Appellant.



Defendant appeals from an order, Supreme Court, Bronx County (Robert A. Sackett, J.), entered March 4, 2014, which denied his CPL 440.10 motion to vacate a judgment of conviction rendered August 16, 2007.




Richard M. Greenberg, Office of the Appellate Defender, New York (Anastasia Heeger, Rosemary M. Herbert and Anant Kumar of counsel), for appellant.
Robert T. Johnson, District Attorney, Bronx (Noah J. Chamoy and Joseph N. Ferdenzi of counsel), for respondent.



MAZZARELLI, J.P.


Sean Worrell was shot and killed in a Bronx movie theater in July 1989. Defendant was arrested shortly after the shooting based on a police interview with Esco Blaylock, a teenager who claimed to have witnessed the shooting, but he was released after Blaylock stopped cooperating with the authorities. After that, the case went cold and remained that way for nearly 10 years. The investigation was revived after Andrew O'Brien, who was serving a 30-year federal sentence for his involvement in a murderous drug gang, told FBI agents who were interviewing him in connection with their ongoing investigation of the gang that he was with Worrell when Worrell was killed, and was prepared to assist in bringing the perpetrator to justice. O'Brien was eventually contacted by a New York City police detective from the cold case squad, who, based on the information he gathered from O'Brien, reopened the case. Defendant was rearrested in August 2006.
At trial, both Blaylock and O'Brien testified that they saw defendant argue with Worrell on the popcorn line, exit the movie theater, and then, minutes later, return with a gun to shoot Worrell in one of the auditoriums. Blaylock, who was working at the concession stand on the [*2]night of the homicide, recognized the shooter as "Leon," a person he knew from the neighborhood and saw regularly. He testified that he recalled describing "Leon" to the police on the day of the incident as a light skinned man who "appeared to be black," with a flat top haircut and a gold cap on a tooth. Indeed, the detective who originally investigated the homicide (retired by the time of trial), confirmed that a DD-5 report he prepared on the date of the shooting, after having interviewed Blaylock, noted that Blaylock had described the perpetrator as a male black who appeared Puerto Rican and could mimic a Jamaican accent. Another witness who testified at trial was Mike Centeno, who was stationed as a security guard near the concession stand on the night of the shooting. Centeno testified that he saw a person with "light-skin like myself" come running out of an auditorium holding a gun after shots were heard inside the same room. Centeno described himself as "Spanish," but also stated that he "assumed" the shooter was a "[l]ight-skinned [b]lack person." Detective Michael Serrano testified that the DD-5 he prepared in connection with his interview of Centeno immediately after the shooting memorialized Centeno's having told him that the person he saw fleeing the auditorium was a black male of dark complexion.
Another witness who testified at trial was Kevin Morrissey. Morrissey testified that he became acquainted with defendant in 2006 when they were housed in the same jail. Morrissey had a paralegal certificate and fashioned himself a jailhouse lawyer. He stated that defendant approached him for help with his case, and that in doing so he volunteered that he had shot someone at a Bronx movie theater after getting into an argument with that person. Morrissey acknowledged that the reason he was in jail was because on five separate occasions he had attempted to purchase cars using phony checks and that it would be fair to characterize him as a professional con man.
Defendant was convicted of second-degree murder and sentenced to a term of 22 years to life. On direct appeal to this Court, he argued that the verdict was against the weight of the evidence, that the court erred in denying his request for a justification charge, that the prosecutor made improper remarks in summation, that his constitutional speedy trial rights were violated, and that the sentence was excessive. This Court unanimously affirmed defendant's conviction (71 AD3d 483 [1st Dept 2010), lv denied 15 NY3d 752 [2010]), observing, with respect to the weight of the evidence:
"Two witnesses (one of whom was acquainted with defendant) having no connection with each other identified the same person and gave essentially similar accounts of the incident. Moreover, defendant's confession to an informant contained significant details that confirmed the informant's credibility" (71 AD3d at 483).
This appeal is from the denial of defendant's motion to vacate his conviction pursuant to CPL 440.10. The grounds for vacatur were actual innocence, failure to turn over exculpatory and impeachment material pursuant to Brady v Maryland (373 US 83 [1963]), prosecutorial misconduct, and ineffective assistance of counsel. The actual innocence claim was based on the statements of two people who claimed to have been in the movie theater on the night Worrell was killed but who did not testify. Defendant claims that both witnesses told an investigator hired by appellate counsel that the person who shot Worrell either had brown or black skin, and that defendant, whose photograph they were shown, was not that man. Defendant complained of multiple Brady violations based on the prosecution's failure to turn over materials that he claimed would have significantly assisted his trial counsel in impeaching the People's witnesses. For example, he presented documents that he claimed demonstrated that O'Brien had been promised that the United States Attorney's Office that prosecuted him for his gang involvement would seek a reduction of his 30-year sentence in exchange for his cooperation against defendant. [*3]He also claimed that the prosecution should have disclosed Morrissey's involvement in several federal trials, which would have revealed that he had a history of serious mental illness and that he had acted as an informant in the past. Additionally, defendant contended that Morrissey and O'Brien had significant criminal histories beyond what had been disclosed to him before trial. He also argued that several significant documents relating to the police investigation were either not turned over at all or were not produced to the defense until the eve of trial or during jury selection.
The prosecutorial misconduct claim was based on the District Attorney's allegedly having allowed trial witnesses to offer false testimony at trial. Finally, defendant asserted that his trial counsel was ineffective because he failed to seek dismissal of the indictment based on the 17 years that had passed between the homicide and the filing of charges; failed to properly handle a suppression hearing; failed to cross-examine O'Brien and Blaylock on certain prior inconsistent statements; failed to call certain witnesses; failed to argue that Worrell had actually been killed by his own friends' "friendly fire"; and failed to move for a mistrial when the prosecutor misstated certain facts.
Supreme Court denied defendant's motion without a hearing. Even assuming that CPL 440 permits a free-standing actual innocence claim based on evidence other than DNA, the court stated, the proffered witness statements did not "deviate from the description provided by all of the eyewitnesses to the argument and the shooting: that the shooter spoke with a Jamaican accent and had brown skin." As to defendant's Brady claim, the court concluded that the additional impeachment evidence pertaining to Morrissey and O'Brien was cumulative of whatever had been disclosed and that any failure by the prosecution to turn over material was not willful. The court also held that certain information that defendant asserted was exculpatory or impeachment material could have been discovered independently by him based on material that was disclosed. With respect to Morrissey's mental condition, the court credited the prosecutor's statement in an affirmation that she met with Morrissey on several occasions and had no reason to believe he had any mental issues. The court also found that there was no evidence that defendant could point to that would suggest that the People had agreed to help O'Brien seek a reduction in his sentence, and that evidence related to O'Brien's unrelated racketeering and conspiracy case was collateral to defendant's case. Finally, the court determined that defendant's claims of prosecutorial misconduct were conclusory and that he had received the effective assistance of counsel.
In People v Hamilton (115 AD3d 12 [2d Dept 2014]), the Second Department recognized a freestanding claim of actual innocence as a ground on which a defendant may challenge his conviction under CPL 400.10(1)(h). That section provides for vacatur of a judgment of conviction that "was obtained in violation of a right of the defendant under the constitution of this state or of the United States."
The Hamilton court reasoned that,

"[s]ince a person who has not committed any crime has a liberty interest in remaining free from punishment, the conviction or incarceration of a guiltless person, which deprives that person of freedom of movement and freedom from punishment and violates elementary fairness, runs afoul of the Due Process Clause of the New York Constitution," and also "violates the provision of the New York Constitution which prohibits cruel and unusual punishments" (115 AD3d at 26).

We agree with the Second Department that CPL 440.10(1)(h) embraces a claim of actual innocence. If depriving a defendant of an opportunity to prove that he or she has not committed a crime for which he or she has been convicted is not a "violation of a right . . . under the constitution of this state or of the United States," then that section of the statute is virtually hollow. Both constitutions guarantee liberty through their due process clauses, and a wrongful [*4]conviction represents the ultimate deprivation of liberty. Notably, the People do not contest the applicability, in theory, of Hamilton to this case.
Nevertheless, defendant did not clear the threshold set by the Hamilton court as necessary to gain a hearing on an actual innocence claim, because he did not present "a sufficient showing of possible merit to warrant a fuller exploration by the court" (id. at 27 [internal quotation marks omitted]). This is the sole articulation in Hamilton of a standard governing when a hearing is warranted on such a claim. However, this specific standard for actual innocence claims should be considered in light of, and alongside, the more general standard applicable on any motion to vacate a conviction brought under CPL 440.10. Thus, statements of fact supporting the motion must be sworn (People v Simpson, 120 AD3d 412, 412 [1st Dept 2014] ["[W]here a CPL 440.10 motion is based upon the existence or occurrence of facts, the motion papers must contain sworn allegations of such facts CPL 440.30[1][a])", lv denied 24 NY3d 1046 [2014]). Further, hearsay statements in support of such motions are not probative evidence (see People v DeVito, 287 AD2d 265, 265 [1st Dept 2001], lv denied 97 NY2d 753 [2002], cert denied 5437 US 821 [2002]) [holding that the defendant was not entitled to vacatur of conviction based on newly discovered evidence that was comprised in part of an affidavit based on hearsay].
Defendant's claim that he is actually innocent is based on the existence of two proposed witnesses. The first witness, Maxine Littlejohn, lives in Kingston, Jamaica, and was interviewed by a private investigator working for the defense. The investigator stated in an affidavit that Littlejohn confirmed that she had accompanied Worrell, O'Brien and others to the movies on the night Worrell was shot, and that she had witnessed the shooting. Upon viewing a photo of defendant from 1989, Littlejohn stated that she had never seen him. Further, she described the shooter as "tall," "brown" and Jamaican, noting that he "spoke with a Jamaican accent." The second witness on whom defendant now relies is Dean Beckford, who also was at the theater with Worrell and the others. Beckford submitted an unsworn statement in support of defendant's motion that reads, in its entirety: "[Defendant] was not the perp in 1989 at the Batman movie to my recollection. He was a black individual."
Quite simply, this evidence is insufficient to warrant a hearing on actual innocence. The Littlejohn statement, recounted in the affidavit by defendant's investigator, is patent hearsay. In any event, Littlejohn is not subject to the jurisdiction of the courts of this State, and defendant offers no assurance that she would voluntarily appear to testify at a hearing or at a new trial. As stated, the Beckford statement is unsworn. We recognize that Hamilton anticipates the admission at an actual innocence hearing of "all reliable evidence, including evidence not admissible at trial based upon a procedural bar—such as the failure to name certain alibi witnesses in the alibi notice" (115 AD3d at 27). However, even were an unsworn statement to be considered admissible under this relaxed standard, we find that there is nothing inherently reliable about either the Littlejohn statement or the Beckford statement. Both were given many years after the shooting, contain a lack of detail tending to explain why their recollections can be considered accurate, and were made at the specific behest of an agent for defendant.
Further, even if true, the statements do nothing to negate the competing evidence that a jury has already heard, weighed, and relied on to convict defendant. In addition to the general concept recognized in Hamilton that a claim for actual innocence is found in CPL 440.10(1)(h), we adopt the proposition, also articulated in that case, that "[m]ere doubt as to the defendant's guilt, or a preponderance of conflicting evidence as to the defendant's guilt, is insufficient, since a convicted defendant no longer enjoys the presumption of innocence, and in fact is presumed to be guilty" (115 AD3d at 27). Applying that standard, even were Littlejohn and Beckford to testify at a new trial, their testimony that defendant was not the person who shot Worrell would, at best, only compete against the testimony of Blaylock and O'Brien, who testified that they saw [*5]defendant shoot Worrell. Moreover, while there was certainly some confusion at trial over the complexion of the perpetrator (especially during the testimony of Centeno, the security guard), the proposed evidence that the shooter was black does nothing to resolve it. Indeed, Blaylock testified at trial that the perpetrator (whom he identified as defendant) was a light-skinned man but "appeared to be black."
Further, Littlejohn's statement that the shooter was Jamaican is not necessarily inconsistent with Blaylock's having told Detective Serrano that the shooter could put on a Jamaican accent. Most importantly, Morrissey's testimony did not depend on any description of defendant's skin tone. As this Court observed in affirming defendant's conviction, "[D]efendant's confession to an informant contained significant details that confirmed the informant's credibility" (71 AD3d at 483). Again, the new evidence, even assuming it presents "a preponderance of conflicting evidence as to . . . defendant's guilt" (Hamilton, 115 AD3d at 27), is, standing alone, insufficient to raise a question of actual innocence.
To the extent defendant questions the credibility of some witnesses at trial, we disagree that such credibility issues would, in light of the new evidence, warrant a hearing on actual innocence. Many criminal trials feature witnesses whose credibility is challenged and procedures such as identification that are less than perfect. However, we give great deference to the jury's ability to resolve these issues. Were we to recognize a stand-alone actual innocence claim, a hearing would be warranted only where the proffered evidence, accepted as true, raised serious doubt about the defendant's guilt. Indeed, in Hamilton, the court ordered a hearing upon the defendant's showing that the principal witness against him had recanted, coupled with evidence of a credible alibi (115 AD3d at 27). Neither of those things exists in this case, nor does anything of a qualitatively similar nature.
We note that defendant's proffered evidence supporting his actual evidence claim is not all the new evidence that would necessarily come out at a hearing. For example, the People claim that they would offer the testimony of Christopher Cordero, who was working at the theater on the night of the shooting. In 2006, Cordero was shown a photograph of defendant and identified him as being one of the people involved in the argument at the concession stand on the night of the homicide. The People also state that a former girlfriend of defendant's told police investigators that defendant attempted to procure a false alibi from her by imploring her to say, if asked, that he was with her at the time of the shooting. To be sure, defendant asserts that this evidence is refutable. However, it demonstrates that, for each new witness who defendant claims can unequivocally establish his innocence, there is another who can raise serious doubt about it, to say nothing of witnesses who actually testified at trial.
We now turn to the alleged Brady violations. To prevail on a Brady claim, "a defendant must show that (1) the evidence is favorable to the defendant because it is either exculpatory or impeaching in nature; (2) the evidence was suppressed by the prosecution; and (3) prejudice arose because the suppressed evidence was material" (People v Garrett, 23 NY3d 878, 885 [2014] [internal quotation marks omitted]). "Where . . . the defense did not specifically request the information, the test of materiality is whether there is a reasonable probability that had it been disclosed to the defense, the result would have been different — i.e., a probability sufficient to undermine the court's confidence in the outcome of the trial" (People v Hunter, 11 NY3d 1, 5 [2008] [internal quotation marks omitted]). However, where, as here, the defense has made a specific request for particular exculpatory information, the information is material if there is a "reasonable possibility" that, had the material been disclosed, the result would have been different (People v Bond, 95 NY2d 840, 843 [2000] [internal quotation marks omitted]). Further, a prosecutor has a duty to learn of any favorable evidence known to others in the prosecutor's office (see People v Steadman, 82 NY2d 1 [1993]), as well as others acting on the government's behalf, including police agencies (Kyles v Whitley, 514 US 419, 437-438 [1995]; People v [*6]Wright, 86 NY2d 591, 598 [1995]).
Defendant's Brady claims, for the most part, involve material that the prosecution concedes was not produced. Accordingly, most of the claims can be decided as a matter of law. With respect to Morrissey, defendant argues that non-disclosure of Morrissey's federal conviction history, as well as examples of his mendacity in testimony he supplied in those federal trials, deprived him of crucial impeachment material. He also claims that his appellate defenders, in reading transcripts of federal trials in which Morrissey testified, discovered that Morrissey had serious mental health issues, although he was never found incompetent to testify.
With respect to the federal crimes themselves, they are similar to the crimes that were disclosed and that Morrissey admitted established him as a con artist. Accordingly, evidence of the federal crimes is cumulative, and it cannot be said that it is possible that its injection into the trial would have changed the outcome. This applies also to any false testimony Morrissey may have given in those trials, since his basic untrustworthiness was evident and undisputed. The transcripts from the federal trials in which Morrissey was involved and that were not disclosed undoubtedly contained references to mental illness. However, defendant had an opportunity to become aware of defendant's possible mental illness from another source that his trial counsel clearly knew about. Counsel cross-examined Morrissey about a case that was pending against him in Queens County at the time of defendant's trial, and defendant concedes that the public court file in the Queens case contained an "After Care" letter stating that Morrissey has "Schizophrenia, Undifferentiated Type," and that the court jacket from that case reflected that Morrissey was examined in a February 2007 competency hearing. Accordingly, defendant had independent access to the impeachment material he now claims the prosecution failed to disclose. The People therefore were relieved of their own obligation to produce it (see People v Doshi, 93 NY2d 499, 506 [1999]).
Regarding O'Brien, the prosecutor stated that she had inadvertently failed to turn over transcripts of his testimony in the trial involving his gang activity. The prosecutor asserts that she received this material from the United States Attorney's Office less than a week before trial, within a voluminous quantity of other materials. The undisclosed testimony detailed O'Brien's involvement in crimes he had committed as a gang member, including attempted murder. Further, it contained admissions by O'Brien of extensive drug use. Defendant also complains that he was not provided with an FBI report, prepared after O'Brien was interviewed by New York City and federal law enforcement personnel about the many crimes he was involved in and many of which he had knowledge. The report contains a highly detailed recounting of the facts surrounding many of those crimes. However, it has a mere three lines about Worrell's murder, stating only: "O'Brien said this individual was killed in the Bronx, White Stone Movie Theatre, and his mother lived on 45th Street in Brooklyn." Defendant contends that the report could reflect the fact that O'Brien was not forthcoming about the murder of Worrell because he knew far less about it than he let on at defendant's trial.
We agree with the motion court that none of these materials, had they been available to the defense before the trial, had a reasonable possibility of changing the outcome. The FBI report that defendant asserts contained a suspiciously cursory description of Worrell's murder is not material. The report was primarily about O'Brien's involvement in gang activity and the people who traveled in the same orbit with him. At one point in the interview he was asked to identify photographs of approximately 40 of those people. One of them was Worrell, and O'Brien gave the same short description of him as he gave for each of the other people. There is no indication that it would have been appropriate, in the context of the interview, for O'Brien to describe Worrell's murder in detail or to offer that he had witnessed it.
Defense counsel's cross-examination of O'Brien amply elicited the unsavory elements of his character, manifested by his racketeering conviction, which, by his own admission at trial, [*7]involved a conspiracy to distribute narcotics, a conspiracy perpetuated by murder where necessary. Further, the cross-examination revealed O'Brien's convictions, shortly before Worrell's murder, for weapons and drug possession. Any further impeachment material would merely have been cumulative, and as such, cannot be considered material for purposes of finding a Brady violation (see People v Nelson, 63 AD3d 629, 630 [1st Dept 2009], lv denied 13 NY3d 861 [2009]).
Defendant claims that the motion court failed to analyze his Brady claims on a collective basis, which we agree is the appropriate standard (see Kyles v Whitley, 514 US at 436). However, while our discussion of the foregoing Brady claims herein is necessarily taken item by item, we do not lack confidence that the trial's outcome would have been the same had the material, viewed collectively, been produced (see id. at 453). Wearry v Cain (__ US __, 136 S Ct 1002 [2016]), which suggests that undisclosed evidence of even seemingly marginal utility can undermine confidence in a jury's guilty verdict, is inapposite. In Wearry, "[t]he State's trial evidence resemble[d] a house of cards, built on the jury crediting" a main witness's testimony that the defendant committed the murder over the defendant's alibi evidence (id. at 1006). Indeed, the Brady material that was not disclosed in Wearry tended to directly call into question the very story that the main witness told on the stand. Here, by contrast, the People introduced three witnesses with no connection to each other, one of whom testified that defendant confessed to him, and there was no alibi evidence. Further, the Brady material that defendant complains was not disclosed did not, as in Wearry, directly challenge the People's theory.
The same, however, cannot be said for the issue of O'Brien's possible deal to testify in this case. The prosecutor, when disclosing him as a witness, volunteered only that O'Brien was serving a 30-year sentence in federal prison for an unrelated murder and had asked her for a letter that "he can have put in his file stating that he testified for the Bronx District Attorney's Office." At trial, the prosecutor asked O'Brien, "What is your understanding of what if anything I can or will do for you in exchange for you testifying here today for us?" O'Brien replied, "Well, my understanding is that you'll just tell the Federal prosecutors that I cooperated with ya'll and that's it." O'Brien also confirmed that he was "a sentenced prisoner" with "18 years to go."
Defendant asserts that the prosecutor violated her Brady obligations by failing to disclose the plea agreement O'Brien entered into in 1997, which obligated him to cooperate with authorities investigating and prosecuting crimes of which he had knowledge, copies of letters written by O'Brien to a federal judge seeking a further sentence reduction in part in the interests of justice, and an email from the prosecutor to the Assistant United States Attorney before defendant's trial stating that she was aware that O'Brien was seeking a sentence reduction in federal court.
The prosecutor denies that she even knew what a federal Rule 35 motion was at the time of defendant's trial, much less that she knew the U.S. Attorney would make one if O'Brien testified against defendant. However, the prosecutor, instead of merely placing a letter in O'Brien's "file," wrote a letter to the U.S. Attorney a few months after defendant's conviction, detailing O'Brien's cooperation and praising him for his assistance. While none of these things establishes that the Bronx prosecutor knew there was a quid pro quo in place for O'Brien's testimony, defendant has made a sufficient showing to warrant a hearing on the issue. Were defendant to establish at a hearing that the prosecutor knew that O'Brien had been given a specific quid pro quo for his testimony, it could be concluded that there is a reasonable possibility that had the jury been aware of that fact, its verdict would have been different, thus requiring reversal of the conviction and a new trial (see People v Vilardi, 76 NY2d 67 [1990]. While O'Brien was not the only witness to inculpate defendant, applying this standard is consistent with the goal of providing a meaningful remedy for Brady violations that suggest prosecutorial misconduct (id. at 75-76 ["We have long emphasized that our view of due process [*8]in this area is, in large measure, predicated both upon elemental fairness to the defendant,' and upon concern that the prosecutor's office discharge its ethical and professional obligations"]).
None of the other Brady issues raised by defendant warrants reversal, much less a hearing. For example, the 1996 handwritten note relaying a telephone message from a Detective Carbone, who was investigating O'Brien's gang activity, and referring to both the 1989 shooting at the Bronx theater, and to O'Brien as "our perp," was apparently obtained by defense counsel before trial, given that counsel made explicit reference to the note during O'Brien's cross-examination. In any event, the note is too equivocal and vague in its language to constitute material that potentially calls into question defendant's guilt or even O'Brien's credibility as a witness.
The ballistics evidence presented by defendant is similarly equivocal. The People give a reasonable explanation for the voucher numbers that defendant now claims were not disclosed, that is, that the numbers are associated with a homicide that occurred nearly two months after the murder at issue, and that the cartridge cases recovered at the later crime scene were compared for investigative purposes to the cartridge cases recovered at the movie theater. Defendant offers nothing but speculation in claiming that the "Ballistics Unit Case Worksheet," which lists voucher numbers from both homicides, establishes that additional ballistics evidence was recovered at the scene of Worrell's murder that was not turned over to the defense. Finally, we perceive no Brady issue with respect to material that was disclosed no later than during jury selection, since defendant fails to specify how the material might reasonably have altered the trial's outcome had it been furnished in a more timely manner. In any event, defendant could have raised the issue on direct appeal, but failed to do so.
We find no basis for determining that the prosecutor knowingly elicited perjurious, as opposed to inconsistent, testimony from any of the People's witnesses (see People v Kitchen, 162 AD2d 178 [1st Dept 1990], lv denied 76 NY2d 941 [1990]). Further, the testimony at issue was subjected to cross-examination based on those inconsistencies, so the jury had an opportunity to reject it (see People v Johnson, 6 AD3d 226, 228 [1st Dept. 2004], lv denied 3 NY3d 642 [2004], 3 NY3d 708 [2004]).
Finally, we find that defendant received effective assistance under the state and federal standards (see People v Benevento, 91 NY2d 708, 713-714 [1998]; Strickland v Washington, 466 US 668 [1984]). Defendant has not shown that any of counsel's alleged deficiencies fell below an objective standard of reasonableness, or that, viewed individually or collectively, they deprived him of a fair trial or affected the outcome of the case. There is no reason to believe that any of the additional pretrial and trial measures that he claims should have been taken by counsel had any reasonable hope of success.
Accordingly, the order, Supreme Court, Bronx County (Robert A. Sackett, J.), entered March 4, 2014, which denied defendant's CPL 440.10 motion to vacate a judgment of conviction rendered August 16, 2007, should be reversed, on the law, and the motion granted to the extent of remanding the matter for a hearing on whether the People committed a violation pursuant to Brady v Maryland (373 US 83 [1963]) by not disclosing the terms of an agreement to assist in a sentence reduction for People's witness Andrew O'Brien, if such an agreement existed.
All concur except Acosta, J. who concurs in the result only.
Order, Supreme Court, Bronx County (Robert A. Sackett, J.), entered March 4, 2014, reversed, on the law, and the motion granted to the extent of remanding the matter for a hearing on whether the People committed a violation pursuant to Brady v Maryland (373 US 83 [1963]) by not disclosing the terms of an agreement to assist in a sentence reduction for People's witness Andrew O'Brien, if such an agreement existed.
Opinion by Mazzarelli, J. All concur except Acosta, J. who concurs in the result only.
Mazzarelli, J.P., Acosta, Moskowitz, Richter, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: JULY 21, 2016
CLERK