■ The People of the State of New York, Respondent, v Roland Barnes, Appellant. [965 NYS2d 488]—

Judgment, Supreme Court, New York County (Jill Konviser, J.), rendered May 4, 2010, as amended May 12, 2010, convicting defendant, after a jury trial, of criminal possession of a controlled substance in the third degree and criminal sale of a controlled substance in or near school grounds, and sentencing him, as a second felony drug offender whose prior felony conviction was a violent felony, to concurrent terms of $7^{1}/_{2}$ years, unanimously reversed, on the law, and the matter remitted for a new trial.

Defendant was arrested in a "buy and bust" operation. According to the trial testimony of an undercover police officer, defendant approached him on 114th Street near Seventh Avenue and offered him drugs. The officer handed defendant pre-recorded buy money, and defendant gave him a purple bag containing what was later determined to be crack cocaine. The undercover officer radioed his team that there had been a "positive buy," and gave a description of the suspect. Shortly thereafter, a detective saw defendant, who matched the description of the seller, on 114th Street and detained him. When the undercover officer saw defendant in police custody, he radioed confirmation that defendant was the seller.

The detective who detained defendant testified at trial that upon a search, he recovered from defendant's right pant's pocket five Ziploc bags, each containing what appeared to be drugs that matched the drugs purchased by the undercover officer. He gave the seized Ziploc bags to another detective present at the scene who testified that the pre-recorded buy money was not recovered from defendant.

Defense counsel asked the two detectives to explain how they generally determine that drugs purchased in an undercover operation match the drugs subsequently recovered from the suspect. One of the detectives testified that the determination is made when a "supply . . . resembles . . . exactly that which was allegedly sold." The other explained that it is when the drugs possessed by the defendant are "similar to what the undercover had purchased." Defense counsel then asked him to clarify that it is not merely "similar" but "exactly the same" packaging. Defense counsel suggested, and the detective confirmed, that "[i]f they were blue top, hard plastic vials with a picture of a cartoon character on it, a matching stash would have . . . the same color cap, the same cartoon character."

Defendant testified in his own defense. He stated, among other things, that "[the police] said . . . they found three vials of crack," and that he saw a "paper that they claim that it was

in, and I didn't understand that because when my lawyer showed it to me and said they was purple but the one they allegedly tested was white, so . . . I don't even know what's really going on." Defendant denied possessing or selling any drugs on West 114th Street on the day in question.

Defense counsel opened his summation by reminding the jury that in his opening arguments he predicted three issues that would be borne out by the testimony and would throw a shadow of reasonable doubt on defendant's guilt: (1) whether defendant had a female accomplice; (2) whether the undercover officer radioed his colleagues to report that defendant and his alleged accomplice had crossed the street to join a group of people; and (3) the failure of the police to recover the pre-recorded buy money. With respect to the first issue, defense counsel noted that his cross-examination of the undercover officer raised a question as to whether the officer had omitted any mention of a female accomplice in his testimony to the grand jury. With respect to the second, counsel noted the arresting detective's testimony that he never received information from the undercover that defendant and his accomplice crossed the street where they joined a group of people, and that the second detective confirmed the communication with great equivocation. Addressing the third issue, defense counsel called it the "single most important piece of evidence that a case such as this could possibly have."

In addition, defense counsel argued that the purple Ziploc bag of crack sold to the undercover did not match the Ziplocs recovered from defendant. Counsel asked for permission to open the bags containing the drugs to display to the jury, but the court denied the request. Counsel then urged the jurors to examine the evidence themselves, arguing that if the jury compared the purchased Ziploc to the ones found on defendant at the time of his arrest, it would find that they are "vastly different." He stated that the purchased Ziploc "doesn't even look purple and I am not sure there is a zip on it. You see how big it is . . . You take a good close look at it." Counsel also urged the jury to "take a good, close look at the . . . supposed matching stash . . . [T]ake a look at . . . the size of these glassine envelopes. Not even remotely close to the same size. Not even remotely close to the same color. This one is clear and even though they keep calling these purple, in fact, this looks like pink to me." Counsel again emphasized the relative difference in the sizes of the bags and asserted that "[t]he five bags that were supposedly taken out of the change pocket of [defendant] don't look anything at all like the bag that [defendant] is al-

leged to have sold[,] yet from the witness stand the police proudly proclaim we got the drugs; we got the matching stash; we got him."

During deliberations, the jurors sent out a note stating, with regard to the Ziplocs, that "[t]he sale bag is folded in such a manner that makes it difficult for us to determine whether it's the same as the other five bags. In order to make that determination, which seems important to us, we need to see the sale zip unfolded with the other five zips unfolded, too, arranged so that we can make a reliable comparison." The court accommodated the jury's request, and while the jurors were in the courtroom, a court officer cut open the previously heat-sealed bags containing the Ziplocs, and, in accordance with defense counsel's request, unfolded the bags.

After the jury returned to the jury room, defense counsel acknowledged that, contrary to his summation argument, all the bags did match. He stated, "I now see for, frankly, the very first time that a bag, a very small plastic bag, that does indeed appear to be the same color as . . . the five bags in People's exhibit 6." Counsel noted that he had asked to open the bags during his summation, and "at the time this outside bag was folded so many times as to virtually secrete and hide the smaller [Ziploc] bag . . . that's about fingernail sized." Counsel further stated that his inability to see the stash clearly caused him to argue a point that was "at least somewhat inaccurate . . . I made a major point of saying that this bag did not match the other five. And part of that argument was based on the fact that the way the bag was folded over . . . it seemed to hide or secrete the fact that the purple or pink bag was, indeed, under two or more layers of folded plastic. Now that I see that it was open . . . indeed, this bag that's alleged to be the sale bag does match the bags that were alleged to have been recovered from [defendant]." Counsel noted that if he had been able to open the bags during summation, "I might not have made the argument I did make."

The court responded that defense counsel was an experienced attorney in drug cases and "certainly could have requested inspection of those items at any time during the past eight or nine months or however long this case is pending," and, for safety reasons, the court could not, without any advance notice, allow him to open the bags in the middle of his summation. The court added that the People's theory had always been that the purchased drugs matched the drugs found with defendants, and that when the court looked at the evidence, "the Ziplocs match was clear to me." Defense counsel noted that, even if he had

asked to view the evidence earlier, it would have been shown in the unopened bags in which they were initially brought into court. The court responded, "I don't know if that's so."

The following morning, in response to a request from the jury, the court read the arresting officer's testimony regarding his observations of the alleged female accomplice at the time of the arrest. The jury subsequently sent another note stating that it had reached a verdict on one count but was deadlocked on the remaining two counts. The court instructed the jury to continue deliberating. Thereafter, the jury requested and heard all of the undercover officer's testimony, as well as the definition of "reasonable doubt." At the end of the day, the jury sent a note stating that it still could not reach a unanimous verdict on at least one count. The court delivered a charge pursuant to *Allen v United States* (164 US 492 [1896]). After deliberating throughout the next morning, the jury found defendant guilty of criminal sale of a controlled substance in or near school grounds and criminal possession of a controlled substance in the third degree.

Defendant argues that he was deprived of his right to the effective assistance of counsel under state and federal constitutional law because his attorney erroneously argued to the jury that the Ziploc bags recovered from him did not match the Ziploc bag purchased by the undercover officer. Defendant contends that, apart from counsel's challenge to the credibility of the police witnesses and his arguments concerning the absence of buy money, this was the heart of his defense. He further contends that he testified that defense counsel had advised him that the Ziplocs did not match, and that had he known the truth, he may not have testified. Defendant notes that, by raising such an untenable argument regarding the stashes, defense counsel undermined his own credibility with respect to other arguments he made.

As a preliminary matter, we recognize that a challenge to a conviction based upon ineffective assistance of counsel must ordinarily be made in the context of a motion to vacate the conviction pursuant to CPL 440.10. This is because the factors that motivate counsel to try a case in a particular manner are usually not evident from the face of the record (*see People v Rivera*, 71 NY2d 705, 709 [1988]). Nevertheless, "[i]n the rare case, it might be possible from the trial record alone to reject all legitimate explanations for counsel's" allegedly ineffective tactics (*id.*). This is such a rare case. Counsel made clear on the record that the only reason he argued on summation that the purchased drugs differed from those recovered from defendant was because he never had the opportunity to compare the two

sets of Ziploc bags, and that had he known the true situation he would not have made the argument. Under such circumstances, where counsel's thought process needs no further elucidation, it is appropriate to consider the ineffective assistance claim on direct appeal.

To establish ineffective assistance of counsel under New York law, a defendant must prove that counsel's performance, viewed in its totality, did not amount to meaningful representation (*see People v Benevento*, 91 NY2d 708, 711-712 [1998]). Mere losing tactics do not suffice to establish ineffective assistance (*id.* at 712). Rather, the defendant must demonstrate the absence of any legitimate or strategic explanation for defense counsel's action (*People v Rivera*, 71 NY2d at 709). However, "[w]here a single, substantial error by counsel so seriously compromises a defendant's right to a fair trial, it will qualify as ineffective representation" (*People v Hobot*, 84 NY2d 1021, 1022 [1995]). At bottom, the analysis turns not on whether the defendant would have been acquitted but for counsel's error, but rather on whether defendant was deprived of a fair trial (*Benevento*, 91 NY2d at 714 [stating that "(w)hile the inquiry focuses on the quality of the representation provided to the accused, the claim of ineffectiveness is ultimately concerned with the fairness of the process as a whole rather than its particular impact on the outcome of the case"]).

Pursuant to federal law, to vacate a conviction based on ineffective representation a defendant must show that his attorney's performance was professionally unreasonable, and that there was a reasonable probability that, but for counsel's unprofessional conduct, the result of the proceedings would have been different (*Strickland v Washington*, 466 US 668, 689-692 [1984]). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" (*id.* at 694).

Defendant's counsel's strategy for securing an acquittal was twofold; attacking the credibility of the People's witnesses and focusing the jury on the lack of sufficient physical evidence tying defendant to the drug sale. Counsel created a credible issue on the first prong of his theory by eliciting evidence suggesting that the undercover may have given conflicting testimony about the presence of a female accomplice, and may have fabricated part of his testimony regarding what he told his colleagues immediately after he purchased the drugs at issue. Counsel also created a material question for the jury by establishing for them that the pre-recorded money, which the undercover testified he gave to defendant, was never recovered.

There is no question that by drawing out this evidence and

bringing it to the jury's attention during his summation, counsel acted reasonably. However, counsel acted unreasonably when arguing during his summation that the evidence bags containing the drugs which the People alleged were purchased from defendant were not the same or similar to those recovered from him. Without having taken any steps to confirm his theory, counsel cavalierly declared that the purchased drugs and the recovered drugs did not match. So confident in his position was counsel that he then urged the jury to compare the bags for themselves. When the jurors took his advice, they and counsel discovered together that, indeed, the People were correct in arguing that the drugs purchased by the undercover matched the drugs found on defendant.

In focusing on the Ziploc bags, counsel eviscerated his entire strategy. No longer could the jury believe that no physical evidence tied defendant to the charges; to the contrary, counsel pointed them in the direction of strong physical evidence. Further, the jury could not be expected to acquit defendant on the theory that the People's case lacked credibility when his own counsel demonstrated a lack of believability on a critical issue at trial. In addition, defendant's own credibility was directly undermined by counsel's failure to conduct due diligence, since he testified about a discrepancy between the drugs purchased by the undercover and those recovered from him by the police. There was no sound strategy underlying counsel's decision to focus the jury on the evidence bags. By his own admission, it was a mistake, and he would not have highlighted the Ziploc bags had he known their actual contents. This self-sabotage of counsel's defense strategy, albeit inadvertent, was inherently unreasonable and prejudiced defendant's right to a fair trial under New York law (see Hobot, 84 NY2d 1021).

The People argue that the fact that the jury nearly deadlocked suggests that counsel met the relevant standards of effectiveness. As we see it, the opposite is true. Indeed, the jury's difficulty in reaching a guilty verdict permits us to reasonably conclude that, but for counsel's erroneous focus on the Ziplocs, defendant would have been acquitted based on the otherwise reasonable strategy employed by counsel. Thus, counsel also fell short of the federal standard for effectiveness outlined in *Strickland* since the jury's hesitance, coupled with counsel's blunder regarding the Ziploc bags, "undermine[s] [our] confidence" that defendant would have been convicted no matter what (466 US at 694). Concur—Gonzalez, P.J., Mazzarelli, Renwick, Richter and Gische, JJ.