[37 NYS3d 481]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JON-ADRIAN VELAZQUEZ, Appellant.

First Department, September 8, 2016

**APPEARANCES OF COUNSEL**

*Gottlieb & Gordon LLP*, New York City (*Robert C. Gottlieb, Celia Gordon* and *Justin Heinrich* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Hilary Hassler* and *Christopher P. Marinelli* of counsel), for respondent.

**OPINION OF THE COURT**

ANDRIAS, J.

Asserting, inter alia, that two of the four eyewitnesses who

testified against him at trial have recanted their identifications and that the other two have expressed doubts, and that a newly discovered witness claimed that another person confessed to the crime to her, defendant moved pursuant to CPL 440.10 (1) (g) and (h) to vacate his conviction for second-degree murder and lesser offenses based on newly discovered evidence, ineffective assistance of trial counsel and actual innocence. On the extensive record before us, we find that the summary denial of defendant's motion was proper.

Defendant received meaningful representation (*see People v Benevento*, 91 NY2d 708 [1998]). When his submissions are carefully analyzed, it is clear that they do not raise a probability that the outcome of the trial would have been different if the newly discovered evidence had been introduced, and that the possibility of his actual innocence is far too remote to warrant a hearing (*see People v Griffin*, 120 AD3d 1257 [2d Dept 2014], *lv denied* 24 NY3d 1120 [2015]; *People v Woods*, 120 AD3d 595 [2d Dept 2014], *lv denied* 24 NY3d 1090 [2014]). Only one of the two recanting witnesses signed an affidavit; the other refused to swear to his recantation. The two other eyewitnesses, including one who had extensive interactions with defendant shortly before and during the robbery, firmly stood by their identifications. Defendant also failed to present any evidence to support or explain the purported confession, and the person who purportedly confessed denied that he ever made it and offered to take "tests" to prove it. More importantly, the People proved the confession to be highly improbable through compelling and unrefuted documentary and other evidence that the person who allegedly confessed was on a fish processing boat off the Alaskan coast at the time of the murder and, most tellingly, that he had a large facial scar and a heavy accent, characteristics that were not included in any of the descriptions of the shooter given by the eyewitnesses.

Defendant and codefendant Derry Daniels were charged with first-degree murder and related offenses arising out of the shooting death of Albert Ward, a retired police officer, during a January 27, 1998 robbery of the gambling club Ward operated in Harlem. Although the police received various hearsay-based tips that the crime had been committed by others, including "Mustafa" and "Shaq," defendant was identified as the shooter by eyewitness Augustus Brown, after he viewed hundreds of photographs shown to him by the police. Thereafter, Brown and three other witnesses, Ricky Jones, Lorenzo Woodford and

Phillip Jones, all of whom were in the club at the time of the robbery, positively identified defendant as the shooter in separate lineups. At two other lineups, Phillip Jones and Brown identified Daniels as defendant's accomplice.

On September 30, 1999, Daniels pleaded guilty to first-degree robbery in return for a promised sentence of 12 years. During his allocution, Daniel stated that he planned the robbery with defendant, that his role was to duct tape club patrons, and that defendant was the gunman who shot someone he was trying to tape. However, there was no cooperation agreement and Daniels did not agree to testify against defendant.

Defendant maintained his innocence and his case proceeded to a jury trial at which Ricky Jones, Woodford, Brown, and Phillip Jones, all identified him as Ward's killer. Defendant presented interrelated misidentification and alibi defenses, asserting that, at around the time of the shooting, he was at his girlfriend's home, engaged in a 74-minute telephone conversation with his mother. The jury acquitted defendant of murder in the first degree and convicted him of murder in the second degree, attempted murder in the second degree, robbery in the first degree (three counts), and attempted robbery in the first degree. On March 7, 2000, defendant was sentenced to an aggregate term of 25 years to life.

In 2004, this Court affirmed defendant's conviction on appeal, finding, inter alia, that there was no basis to disturb the identifications made by the four eyewitnesses and that the jury properly rejected defendant's alibi defense (13 AD3d 184 [1st Dept 2004], *lv denied* 4 NY3d 857 [2005]). In 2007, based on a careful evaluation of the trial evidence, defendant's petition for a writ of habeas corpus was denied by the Honorable Denny Chin, then of the United States District Court for the Southern District of New York, who found, inter alia, that the testimony of the four eyewitnesses firmly established that they had ample opportunity to examine the gunman's features during the robbery and to confirm his identity in a properly conducted lineup (*see Velazquez v Fischer*, 524 F Supp 2d 443 [SD NY 2007]). Judge Chin also noted that "nothing about the circumstances of the eyewitnesses' identification of [defendant] renders their testimony unreasonable or unbelievable" (*id.* at 449).

In October 2011, defendant's counsel asked the New York County District Attorney's Conviction Integrity Program to review his conviction, questioning the reliability of the eyewitnesses who had identified defendant and claiming that

several of them had recanted their identifications to varying degrees. Without any concrete evidence, counsel also proposed "PT," who had previously used the nickname "Mustafa," as an alternative suspect for Ward's murder. Subsequently, defendant's counsel named "Moustapha D." as Ward's killer, based on a confession he allegedly made to a woman in Washington State, and abandoned their claims related to PT.

On February 12, 2012, NBC broadcast an episode of the program Dateline about defendant's case, which featured excerpts of interviews of Brown and Phillip Jones, who appeared to recant their identifications of defendant. Excerpts of interviews with Woodford, designed to cast doubt on his identification, were also shown.

After thoroughly investigating the case, the People informed defendant that they would not consent to the vacatur of the judgment. The People's investigation found that neither PT nor Moustapha D. could have killed Ward and that defendant's claim that Ricky Jones and Woodford had recanted their trial testimony was inaccurate. In fact, they firmly stood by their original identifications. Moreover, Brown's recantations were marked by inconsistencies and he refused to sign a sworn statement. While Phillip Jones had signed an affidavit for a defense investigator, he stated in two subsequent interviews with the People that he had correctly identified defendant at trial and denied knowingly signing the affidavit. With respect to the polygraph reports submitted in support of defendant's alibi defense, an investigator from the New York County District Attorney's Office, who is a certified polygraphist, opined that the report relating to defendant's mother based on heart monitoring was largely unreadable due to a physical condition or ailment, and that her breathing pattern potentially indicated an attempt to manipulate the test results. As to the report of defendant's charts, the investigator deemed it "inconclusive."

On May 1, 2013, defendant moved pursuant to CPL 440.10 (1) (g) and (h) to vacate the conviction based on newly discovered evidence, ineffective assistance of trial counsel and actual innocence. The new evidence included: (i) the recantations by Brown and Phillip Jones; (ii) the alleged equivocation by Woodford and Ricky Jones regarding their identifications of defendant; (iii) an affidavit, dated October 7, 2012, by "DK" of Kent, Washington, stating, inter alia, that she had known Moustapha D. for about three years, and that about a year and a half earlier, he told her that he had shot and killed a retired

"cop" in New York City and that "someone else was doing his time"; and (iv) statements made by the codefendant's brother indicating that his brother never met defendant. Defendant argued, inter alia, that this evidence, along with the identification process used by the police in this case, rendered the trial identifications highly unreliable and insufficient to support the guilty verdict, especially in the absence of any other evidence connecting him to the murder, the alibi defense and the tips that the crime had been committed by others, including Mustafa and Shaq.

■ There is no merit to defendant's ineffective assistance claim. Defense counsel's alleged deficiencies were tactical choices that could have been made by a reasonably competent attorney. Defense counsel cross-examined the People's witnesses about their opportunity to view the robbers and purported discrepancies between the descriptions provided to the police following the murder and those given at trial; about the circumstances of the lineup identifications; about whether the police pressured the witnesses to cooperate or fed them information about the crime; and, where applicable, about the witnesses' criminal histories and use of controlled substances. Defense counsel also presented testimony in support of defendant's alibi defense and from police detectives about descriptions of the gunman provided by various witnesses in the wake of the murder.

To vacate a judgment of conviction based on newly discovered evidence pursuant to CPL 440.10 (1) (g),

> "the evidence must fulfill all the following requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence" (*People v Deacon*, 96 AD3d 965, 967 [2d Dept 2012], *appeal dismissed* 20 NY3d 1046 [2013] [internal quotation marks omitted]).

The court must consider the parties' submissions "for the purpose of ascertaining whether the motion is determinable without a hearing to resolve questions of fact" (CPL 440.30 [1] [a]). The motion may be summarily denied, in the court's discre-

tion, when the "moving papers" fail to allege a ground "constituting [a] legal basis for the motion"; when essential factual allegations are not supported by sworn allegations or are "conclusively refuted by unquestionable documentary proof"; or when essential allegations are either contradicted "by a court record or other official document" or are made solely by the defendant and there is "no reasonable possibility" that the allegation is true (CPL 440.30 [4] [a], [b], [c], [d]; *see People v Chu-Joi*, 26 NY3d 1105 [2015]).

Defendant's conviction was the result of a lengthy jury trial, presided over by a respected and seasoned judge, in which defendant was represented by experienced and competent counsel, who raised interrelated misidentification and alibi defenses and obtained an acquittal on the first-degree murder charge. Most of defendant's arguments merely rehash the claims he made at trial, in his prior appeal and in his federal habeas corpus petition regarding the alleged insufficiency and weight of the identification evidence, and the credibility of the witnesses, which were found to be unavailing by the jury, this Court and Judge Chin.

█ As to the new evidence itself, recantation of trial testimony is considered to be the most unreliable form of evidence and does not warrant a new trial unless there is compelling evidence of the reliability of the recantations and of other circumstances warranting relief (*see People v Shilitano*, 218 NY 161, 170 [1916]; *People v Lane*, 100 AD3d 1540 [4th Dept 2012], *lv denied* 20 NY3d 1063 [2013]). There is no such compelling evidence here.

Only Brown and Phillip Jones recanted, and Brown refused to swear to his recantation under oath. The other two eyewitnesses, Woodford and Ricky Jones, the latter of whom had repeated and clear opportunities to interact with defendant before and during the crime, have not recanted. Although Phillip Jones signed an affidavit years after the trial, he also made bizarre comments during his interviews with defendant's investigator, "JD," and the People. Phillip Jones told JD that, the night before their interview, he had a "dream" that someone would visit him, woke up, and told his wife, "I think I made a mistake." Phillip Jones explained that he had a power he called the "black veil," which he characterized as an "intuition" that allowed him to "sense things sometimes."

While Phillip Jones asserted in his affidavit that he felt "pressured" to make an identification because the police were

threatening to arrest him and his brother for stealing money from the crime scene, when. JD asked him if detectives had threatened the brothers, he replied, "They didn't even say that," and that the detectives just asked if they knew what happened to the money. When JD implied that detectives "suggested somebody" whom he should identify in the lineup, Phillip Jones said, "No, no, they didn't do that." Phillip Jones also told JD that he felt "pressured" by NBC personnel, who tried to "bribe" him and recanted his recantation in two interviews with the People. When the People confronted Phillip Jones with his affidavit on February 3, 2012, he denied knowledge of its contents and claimed that, during a visit to the offices of NBC, he had been tricked into signing what he thought was a meal receipt.

As for Brown, in addition to refusing to sign an affidavit, there were numerous and significant inconsistencies in his recantations. At certain points, Brown stated that he did not see the perpetrators or only saw them for a "few seconds" and that he picked defendant's photograph at random. At other points, he acknowledged that he got a good enough look to know that defendant "looked similar" to the shooter and that he "thought" defendant "might be" Ward's killer. Casting further doubt on the reliability of Brown's recantation is the fact that during his posttrial interviews, at which he recanted, Brown was incarcerated and admitted that he feared being labeled a "rat" (see People v Cintron, 306 AD2d 151, 151-152 [1st Dept 2003] ["We note that the witness's affidavit here was made almost 10 years after defendant's conviction, and after the witness (became) an inmate of the same prison system in which defendant is incarcerated"], lv denied 100 NY2d 641 [2003]).

Ricky Jones, who had face-to-face interactions with defendant shortly before and during the robbery that lasted nearly 10 minutes, expressed a high level of confidence in his identification. When an NBC producer played a video of defendant for Ricky Jones and asked what he saw, Jones replied: "The guy he did it." Ricky Jones also told the People's investigator that, after watching the episode of Dateline, he was "damn sure" that defendant killed Ward. He told JD that, when he saw defendant in the lineup, he thought defendant was "definitely" the killer.

Defendant states that Ricky Jones said that defendant's brother looked more like the killer than defendant did. However, Ricky Jones responded to such suggestions from JD

by stating, "No, no, no . . . you driving one point to another where it's not consistently going where I'm saying"; and that the investigator was "playing tic-tac-toe" with his words. Ricky Jones explained that when defendant's brother showed up as an observer at trial, he might have chosen him as the perpetrator from a lineup just because he had braids in his hair, which Ward's killer had. However, because of the resemblance, Ricky Jones walked around and sized defendant's brother up. Once defendant's brother did not react to him, Ricky Jones did not believe him to be the shooter.

Woodford told JD more than a dozen times, in substance, "They got the right guy." He also recalled being so shocked to see defendant in the lineup that he felt he was going to "piss on himself" and that he recognized defendant immediately as Ward's killer. Woodford also told Dateline, "The kid that I said did it, that's who did it." Further, in seeking to obtain a recantation, Woodford was given false information by JD, such as that Ricky Jones said that defendant was a "lot taller" than the real killer and that detectives "made some stories up," "lied" at trial, and "ripped apart" a "good alibi." While this briefly "created doubt in [his] mind," Woodford subsequently confirmed to the People that he had recognized defendant as Ward's killer at the lineup, and, that despite fears of retribution, identified him as such.* That the now 66-year-old Woodford, who has cataracts, had difficulty identifying defendant in photographs shown by JD, 12 years after the murder, does not undermine his original identification.

That codefendant Daniels "blamed" defendant for not telling the police that Daniels had "nothing to do" with the robbery, or that his brother stated that Daniels and defendant did not know each other, does not exculpate defendant. Rather, it merely professes Daniels's own innocence. To the extent that Daniels's statements conflict with his sworn plea allocution, in which he admitted to planning and participating in the robbery with defendant, they are inherently untrustworthy and provide an insufficient basis for upsetting defendant's conviction (*see People v Smith*, 108 AD3d 1075 [4th Dept 2013], *lv denied* 21 NY3d 1077 [2013]; *People v McGuire*, 44 AD3d 968, 968-969 [2d Dept 2007], *lv denied* 10 NY3d 813 [2008]).

---

* On October 22, 2014, federal authorities arrested JD and charged him with felony conspiracy for bribing a police officer in order to obtain confidential information from the National Crime Information Center database. On January 20, 2016, JD pleaded guilty to conspiracy.

Nor has defendant shown Moustapha D. to be a plausible suspect. Hearsay evidence of a third-party confession may warrant vacatur of a conviction and a new trial if the petitioner can show a reasonable possibility that the statement is true (*see People v McFarland*, 108 AD3d 1121 [4th Dept 2013], *lv denied* 24 NY3d 1220 [2015]; *People v Deacon*, 96 AD3d 965, 968 [2d Dept 2012], *appeal dismissed* 20 NY3d 1046 [2013]). As the proponent of the confession attributed to Moustapha D., it was incumbent on defendant to demonstrate that there is sufficient competent evidence independent of the declaration to insure its trustworthiness and reliability (*see McFarland*, 108 AD3d at 1122-1123). Simply put, there is nothing either trustworthy or reliable about the purported confession attributed to Moustapha D., or the related contention that he was in New York at the time of the murder, rather than on a fish processing boat in Alaska, and a hearing on defendant's newly discovered evidence claim was not warranted.

DK stated in her affidavit that after his original confession, Moustapha D. showed her defendant's website in March 2012 and purportedly said that he was "supposed to just do a robbery" with his friend "Shaq," but ended up "shooting the cop." However, she failed to provide any details as to the circumstances leading to the purported confession and the sketchy information she provided as to the crime could have just as easily been gleaned from defendant's website itself. Moustapha D. also provided a sworn statement denying the allegations and offered to take "tests" to prove it.

Decidedly, photographs of Moustapha D. taken between 1996 and 1998, including driver's license photographs, show a several-inch long scar on his right cheek. He also spoke English with a heavy accent, having been born in Mauritania and lived in Senegal before he came to the United States. Neither of these characteristics was attributed to the shooter by any of the multiple witnesses to the robbery, some of whom had actual conversations with the defendant. Additionally, documentary evidence, including an employment contract and paychecks, showed that Moustapha D. had moved to Washington State and that at the time of the robbery he was on a fish processing boat in Alaska. There is no evidence whatsoever that he returned to New York during that time period and the newly crafted defense theory that someone else was working on the fish processing boat using Moustapha D.'s identity is unsupported by any evidence and is entirely speculative.

Indeed, Moustapha D.'s attorney submitted a request to the Immigration and Naturalization Service in Seattle to reschedule a January 21, 1998 appointment to an earlier date because Moustapha D. had a "contract to work in Alaska beginning" on January 5th. One of the fish processing ship's owners averred that the ship would have sailed from Seattle and arrived off the Alaskan coast no later than January 20, 1998, so as to be in place for the start of the fishing season, a week before the robbery and Ward's murder. A report issued by the Unalaska, Alaska Department of Public Safety indicates that, on February 19, 1998, Moustapha D. was still in Alaska, in the Aleutian Islands.

To vacate a judgment based on actual innocence pursuant to CPL 440.10 (1) (h), defendant must demonstrate with clear and convincing evidence, which was not presented at trial, his factual innocence, i.e. that he was actually innocent of the crimes for which he was convicted (*see People v Hamilton*, 115 AD3d 12, 23 [2d Dept 2014]; *Bousley v United States*, 523 US 614, 623-624 [1998]). To be sufficient, clear and convincing evidence must establish that the claim asserted is "highly probable." "Mere doubt as to the defendant's guilt, or a preponderance of conflicting evidence as to the defendant's guilt, is insufficient, since a convicted defendant no longer enjoys the presumption of innocence, and in fact is presumed to be guilty" (*Hamilton* at 27).

"A prima facie showing of actual innocence is made out when there is a sufficient showing of possible merit to warrant a fuller exploration by the court" (*Hamilton*, 115 AD3d at 27, quoting *Goldblum v Klem*, 510 F3d 204, 219 [2007], *cert denied* 555 US 850 [2008] [internal quotation marks omitted]). As recently explained by this Court in *People v Jimenez* (142 AD3d 149, 156 [1st Dept 2016]), which agreed with the Second Department that CPL 440.10 (1) (h) embraces a claim of actual innocence,

> "[T]his specific standard for actual innocence claims should be considered in light of, and alongside, the more general standard applicable on any motion to vacate a conviction brought under CPL 440.10. Thus, statements of fact supporting the motion must be sworn (*People v Simpson*, 120 AD3d 412, 412 [1st Dept 2014] ['Where a CPL 440.10 motion is based upon the existence or occurrence of facts, the motion papers must contain sworn allegations

of such facts (CPL 440.30 [1] [a])'], *lv denied* 24 NY3d 1046 [2014]). Further, hearsay statements in support of such motions are not probative evidence (*see People v DeVito*, 287 AD2d 265, 265 [1st Dept 2001], *lv denied* 97 NY2d 753 [2002], *cert denied* 537 US 821 [2002] [holding that the defendant was not entitled to vacatur of conviction based on newly discovered evidence that was comprised in part of an affidavit based on hearsay])."

■ Here, defendant failed to make the requisite prima facie showing. The alleged recantations by two of the four eyewitnesses were shown to be highly suspect and the uncorroborated confession attributed to Moustapha D. was refuted by the overwhelming evidence the People unearthed in their reinvestigation of the crime. Thus, as there was an insufficient showing of possible merit, a hearing on defendant's actual innocence claim was not warranted (*see Hamilton*, 115 AD3d at 27; *Jimenez*, 142 AD3d at 156; *see also People v Jimenez*, 46 Misc 3d 1220[A], 2015 NY Slip Op 50147[U] [Sup Ct, Bronx County 2015] [affidavits containing the recantation of one of two eyewitnesses, and statements of two alibi witnesses, were untrustworthy and insufficient to warrant a hearing on the defendant's actual innocence claim]).

Accordingly, the order of Supreme Court, New York County (Abraham L. Clott, J.), entered November 13, 2014, which denied, without a hearing, defendant's CPL 440.10 motion to vacate a March 7, 2000 judgment, should be affirmed.

MAZZARELLI, J.P., SAXE, MOSKOWITZ and KAHN, JJ., concur.

Order, Supreme Court, New York County, entered November 13, 2014, affirmed.