People v Brown (2024 NY Slip Op 06550)

People v Brown

2024 NY Slip Op 06550

Decided on December 24, 2024

Appellate Division, First Department

WEBBER, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: December 24, 2024
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Troy K. Webber
Barbara R. Kapnick Tanya R. Kennedy Saliann Scarpulla Martin Shulman

Index No. 663/99 Appeal No. 2825 Case No. 2022-05454 

[*1]The People of the State of New York, Appellant-Respondent,
v
Andre Brown, Respondent-Appellant.

The People appeal and defendant cross-appeals, from the order of the Supreme Court, Bronx County (David L. Lewis, J.), entered on or about December 1, 2022, which based on ineffective assistance of counsel, granted defendant's motion pursuant to CPL 440.10(1)(h) to vacate his conviction, rendered June 8, 2000, after a jury trial (same court, Phyllis Skloot Bamberger, J.), of two counts of attempted murder in the second degree, and sentencing him to consecutive terms of 20 years. The parties also appeal and cross-appeal from so much of the same order as denied defendant's motion to vacate his conviction on the grounds of actual innocence and newly discovered evidence.

Darcel D. Clark, District Attorney, Bronx (Paul A. Anderson, Vincent Rivellese and Cynthia A. Carlson of counsel), for appellant-respondent.
Cuomo LLC, Mineola (Oscar Michelen of counsel), for respondent-appellant.

WEBBER, J. 

Defendant was charged by indictment with two counts of attempted murder in the second degree, two counts of assault in the first degree, four counts of assault in the second degree, two counts of criminal possession of a weapon in the second degree, and two counts of reckless endangerment. It was alleged that, on January 15, 1999, at the corner of Britton Street and White Plains Avenue in Bronx County, defendant intentionally shot O'Neill Virgo and Shawn Nicholson.
Thomas Lee represented defendant at trial. The evidence submitted at trial was that on January 11, 1999, following an exchange of gunfire at the same corner at approximately 11:20 p.m., the police recovered seven spent rounds and one live round, which ballistics analysis indicated were fired from two separate guns. On January 13, 1999, the police arrested 18-year-old Virgo for possessing a loaded gun that was recovered from a nearby trashcan. Ballistics analysis demonstrated that the gun matched shell casings recovered from the January 11th shoot-out.
According to the testimony, shortly before 6:00 p.m. on January 15, 1999, as Virgo, Shawn Nicholson, and Courtney Weise stood outside a store on the corner of Britton Street and White Plains Avenue, defendant approached the three, looking "[l]ike he gonna kill somebody," while pulling a black covering over his face. Virgo made eye contact with defendant as he approached and recognized him from his height and build based on a conflict between the two men earlier in the week. Defendant ran toward Virgo while pulling a gun out from his waist as the three unarmed teenagers fled from the corner. When Virgo tripped in the snow and fell to the ground, defendant stood over him and shot him four times. Defendant then chased after Nicholson, who had turned around, and observed defendant shoot Virgo. Defendant removed his mask as he shot Nicholson. Nicholson fell to the ground and lost consciousness. He sustained a gunshot wound to his vertebrae, leaving him paralyzed below the waist.
Weise testified that when he saw the shooter coming towards them, the [*2]shooter was wearing a mask, which he stated was anything that covered the face. Weise ran in a different direction than the others and heard three or four gunshots from behind. After not hearing any additional shots, he slowed down and then returned to the corner where the three had been standing. There, he found Virgo, who stated that he had been shot.
Stephanie Telfer, who was sitting in traffic about half a block away, heard four "popping sounds" and saw defendant, whom she knew from the neighborhood as "Andre." According to Telfer, defendant was chasing a man she did not know while carrying a gun in his right hand. Defendant fired at the man he was chasing. Telfer stated that she heard two or three more popping sounds. Following defendant's arrest, Telfer witnessed a lineup and identified defendant as the shooter.
After Virgo and Nicholson were taken to the hospital, detectives spoke to Shantel Higgins, who reported hearing gunshots and seeing a person sheknew as "Andre." She reported that "Andre" may have been shot on OlinvilleAvenue a year before, that he may also have fired shots "the other night," and that he lived on the second floor of a building on the 2700 block of Barker Avenue.
The next day, Nicholson twice positively identified defendant as the shooter in the same photo array, administered hours apart by different detectives. Nicholson told the detectives that he knew defendant "from the neighborhood" as "Dre." According to Nicholson, he had seen defendant on multiple occasions in the neighborhood, including when defendant would walk his dogs.
The results of the ballistics analysis were introduced into evidence to demonstrate that the gun used to shoot Virgo and Nicholson matched the shells recovered from the January 11th shooting in which Virgo's gun had been used.
Defendant surrendered to the police on January 20, 1999. The arresting detective noted that defendant had "multiple large scars" and skin grafts on his right lower leg from a previous shooting. During a bail application on March 4, 1999, then counsel Ira Brown stated that in January 1998, defendant had sustained nerve damage as a result of having been shot in the leg. According to counsel, defendant was only recently able to walk without a perceptible or slightly perceptible limp, and therefore, could not have run to shoot the victims as alleged. Further, according to counsel, defendant had an alibi for the entire day as he had spent the day with his mother. On July 21, 1999, at another bail application, counsel Brown requested 18-B experts and funds for the needs of the defense. While counsel again made mention of an alibi defense, there was no mention of a medical impossibility defense.
Following his representation of defendant at the suppression hearings in March 1999, defendant terminated counsel Brown's representation and retained Thomas Lee. Despite the approval by the court of the requested 18-B expert funds, there is no record evidence that the medical [*3]records were secured by counsel Brown or turned over to Lee.
At trial, Nicholson, Virgo, Weise, and the police witnesses testified to the above. However, Telfer testified that she did not remember speaking to the police, testifying in the grand jury, or viewing a lineup. She also testified that she did not witness defendant chase and shoot at an individual or witness anything unusual in the area of the shooting.
At a hearing to determine whether Telfer was unavailable as the result of the conduct of defendant or someone acting on his behalf, it was learned that the evening before Telfer was scheduled to testify, she found an envelope on the windshield of her car containing two unspent bullets and a note stating, among other things, "This is what informers get. If my friend get any time! I have much more with your name on it." Based upon this perceived threat, the court allowed the prosecutor to read a portion of Telfer's grand jury testimony into the record.
Defendant was convicted of two counts of attempted murder in the second degree.
At sentencing, the court imposed consecutive prison terms of twenty years. Defendant maintained his innocence and claimed that the victims had lied to the jury. Defendant made no additional statements as to why he could not have committed the crimes charged. Procedural History
On August 19, 2002, defendant requested permission to file a pro se supplemental brief on direct appeal, arguing that Lee was ineffective for not calling defendant's prior counsel to testify at trial regarding the lineup procedure. Defendant asserted that this was despite his "numerous exhortations." Supreme Court granted the motion, but defendant chose not to file a pro se brief and retained counsel to represent him on appeal. This Court affirmed defendant's conviction (see People v Brown, 308 AD2d 379 [1st Dept 2003], lv denied 1 NY3d 595 [2004]).
In a pro se CPL 440.10 motion dated October 6, 2004, defendant argued that Lee was ineffective for failing to investigate the circumstances of the lineup and to call his attorney, who had represented him at the lineup, "to impeach the detective's testimony at the suppression hearing." There were no further arguments as to Lee's alleged ineffectiveness as counsel. Supreme Court denied the motion on April 1, 2005.
On February 22, 2006, defendant, represented by retained counsel, filed a federal habeas corpus petition, claiming that admitting Telfer's grand jury testimony violated his constitutional right to confront witnesses. There was no argument set forth as to ineffective assistance of counsel or defendant's actual innocence. The district court denied the petition (see Brown v Smith, 2008 WL 4922014, 2008 US Dist LEXIS 95697 [SD NY, Nov. 10, 2008, No. 06 Civ 1429 (PKC)]).
On May 23, 2019, some 19 years following his conviction, defendant, represented by retained counsel, filed a second CPL 440.10 motion, claiming, among other things, that, in light of a 1998 gunshot injury and [*4]ensuing surgeries, Lee was ineffective for "failing to establish that defendant's medical condition made it physically impossible for defendant to have chased down Virgo and Nicholson." Defendant also argued that affidavits submitted to the court by Anthony Cleveland and Jamel Graham (two potential witnesses) constituted newly discovered evidence that would have changed the verdict. Finally, defendant argued that he was actually innocent of having committed the crimes charged.
Following a CPL 440 hearing, Supreme Court granted defendant's motion. While the court found Lee to have been effective on the face of the record, and "had done everything right," it nevertheless found Lee ineffective solely on the basis of his alleged failure to investigate the injury to defendant's leg. According to the court, evidence of defendant's injury would have established that defendant was incapable of running the distance and in the manner testified to by the victims and the eyewitness.
With regard to defendant's claim of actual innocence, the court found that defendant had failed to meet his burden to present clear and convincing evidence in support of his claim. The court also rejected defendant's claim of newly discovered evidence. Ineffective Assistance of Counsel
Under the federal standard for ineffective assistance of counsel, defendant must show that (1) counsel's performance was deficient; and (2) the deficiency in performance prejudiced him, i.e., there is a reasonable probability that the result of the proceeding would have been different (see Strickland v Washington, 466 US 668, 687, 694 [1984]). Under New York law, defendant must prove that counsel's performance, viewed in totality, did not amount to meaningful representation (see People v Benevento, 91 NY2d 708, 712-714 [1998]; People v Baldi, 54 NY2d 137, 147 [1981]). He must overcome a "presumption" that the challenged action "might be considered sound trial strategy," and must demonstrate the "absence of strategic or other legitimate explanations" for the alleged shortcomings (see People v Honghirun, 29 NY3d 284, 289 [2017] [citations omitted]). An attorney will not be found to be ineffective for failing to make an argument "that has little or no chance of success" (People v Caban, 5 NY3d 143, 152 [2005]), nor will the attorney be deemed ineffective just because the strategy they choose was a losing tactic (see People v Benevento, 91 NY2d at 712; People v Barnes, 106 AD3d 600, 605 [1st Dept 2013]).
Contrary to Supreme Court's findings, defendant failed to satisfy his burden of establishing "that counsel's performance was constitutionally deficient" (People v Campbell, 30 NY3d 941, 942 [2017], quoting People v Nicholson, 26 NY3d 813, 831 [2016]). The record in this case, including from the CPL 440.10 hearing, makes clear that counsel communicated with defendant and potential witnesses, and analyzed their potential testimony. At the CPL 440.10 hearing, Lee testified that it was his custom and [*5]practice to discuss a case with his client. He stated that he would prepare for hearings and trial by reviewing discovery, and by meeting with his clients and discussing strategies with them. While he had no independent recollection of working with a specific investigator in this case, he testified that he worked with numerous private investigators as a criminal defense attorney.
Further, the trial record reflects that Lee fully examined the discovery materials provided to him, requested additional discovery, and retained an investigator. At trial, Lee conducted a full and rigorous cross-examination of each of the People's witnesses; attacked their credibility; made timely and appropriate objections and motions; and presented a cogent and detailed summation, effectively presenting to the jury a defense centered on the unreliability of the identifications and therefore the misidentification of defendant based upon neighborhood collusion. Indeed, Supreme Court found that on the face of the record, Lee had been effective. The record supports the conclusion that Lee's vigorous and coherent defense, irrespective of any alleged errors and omissions, did not deprive defendant of a fair trial (see e.g. People v Lopez-Mendoza, 33 NY3d 565, 572 [2019]; People v Konsistorum, 3 AD3d 394, 395 [1st Dept 2004], lv denied 2 NY3d 763 [2004]).
Supreme Court erred in finding Lee's representation ineffective for not pursuing a defense of medical impossibility, i.e., that a preexisting injury would have made it impossible for defendant to have committed the crimes charged. By its ruling, Supreme Court ignored well-settled law that "[t]o prevail on a claim of ineffective assistance of counsel, it is incumbent on defendant to demonstrate the absence of strategic or other legitimate explanations for counsel's failure . . . Absent such a showing, it will be presumed that counsel acted in a competent manner and exercised professional judgment" (People v Barboni, 21 NY3d 393, 405-406 [2013], quoting People v Rivera, 71 NY2d 705, 709 [1988]). Here defendant failed to "overcome the strong presumption that [Lee] rendered effective assistance" (People v Ambers, 26 NY3d 313, 317 [2015], quoting Barboni, 21 NY3d at 406).
At the CPL 440 hearing, defendant testified that he sustained a gunshot wound to his leg in January 1998. He acknowledged that he stopped selling crack cocaine as a result of his injury. According to defendant, he was told by his doctors that he "had tibia nerve damage." He stated that he "couldn't move [his] bottom leg" or foot "at all" following the injury.
Defendant stated that in February 1998, he had a second surgery to close a wound surgically created to relieve pressure buildup. Upon discharge, he was provided with an "immobilizer" due to a "dropped foot." Defendant further testified that he used crutches for approximately eight to ten months before switching to a cane; that at the time of the switch, his leg had "atrophied" and he had "a strong [*6]limp"; that while he "didn't have full strength in [his] foot" following the second surgery, his drop foot had improved; that after physical therapy during 1998, he "didn't have drop foot anymore" by the first week of January 1999; and that he had stopped going to physical therapy. Defendant claimed that as of January 1999, he could not have run or jogged from Britton Street to Olinville Avenue as the shooter was said to have done. Defendant acknowledged, however, that his then attorney had told the court in March 1999 that defendant had "just recently been able to walk without a perceptible limp." Defendant testified that this representation was "true." Defendant also acknowledged that when committed to Rikers Island following his arrest, he reported that he was "not suffering from a present injury." His claim that he did request a cane was not noted in the records from Rikers Island.
Defendant also testified that Lee considered and discussed with defendant a justification defense and potential alibi defense. Defendant also acknowledged that Lee obtained subpoenas for two potential witnesses, Jamel Graham and Anthony Cleveland, neither of whom defendant knew.
Ronald Simon, M.D. testified that he treated defendant for the injury to his leg. Simon testified that he had no independent memory of defendant or his medical condition. He based his testimony on defendant's available medical records, which were made available to him prior to the CPL 440 hearing. He testified that the records were incomplete, in that there was no medical documentation as to defendant's condition at the time of the shooting. According to Simon, although he had attempted to obtain "copies of the physical therapy reports" that could have documented "either progress, or lack of progress," those reports were no longer available.
Relying on the available medical records, Simon testified that on January 24, 1998, defendant sustained a gunshot wound to his right calf. After a first surgery, defendant required a second surgery in early February 1998 to close surgically created wounds and physical therapy due to "foot drop" resulting from nerve damage.
Defendant had a third surgery, in which Simon closed the remaining surgically created wounds. Simon testified that he did not know whether defendant complied with instructions to follow up after he was discharged with a plastic surgeon or with a trauma clinic for physical therapy.
Simon testified that between the second and third surgeries, a physical therapist began working with defendant to prevent foot drop from becoming permanent, an effort that included giving defendant a splint to prevent him from dragging his toes on the ground. Simon further testified that he had no knowledge of the rate or extent of defendant's recovery after February 14, 1998. He could not testify with certainty that someone with defendant's injury would never again be able to sprint because "it depend[ed] how the nerve might heal." Simon opined [*7]that "in 11 months [defendant] would not have gone from the significant disability that he had to being able to run a city block." He stated that defendant likely "could have jogged with a limp," "but not run well." During questioning by the assistant district attorney, Simon stated that he was "surprised" to learn that defendant eventually resumed a normal gait.
Supreme Court credited defendant's testimony in all respects, including that he told Lee about the defense of medical impossibility and that Lee ignored it without investigation. While acknowledging that it would be impossible to prove or disprove that Lee possessed the medical records and evaluated them, the court nevertheless found that it could not be assumed that defendant's prior counselIra Brownmade a determination not to pursue the defense or that Lee investigated the defense and decided not to pursue it. Supreme Court incorrectly concluded that "defendant's testimony [was] sufficient to overcome the presumption that Lee was effective."
It is unclear from the record as to whether Lee was informed of the existence of such a defense and that he ignored it without investigation. The record is devoid of any evidence, including an affidavit from counsel Brown, as to whether Brown followed up on securing the medical records or whether he informed Lee of their existence and possible significance. While Lee testified that he had no recollection of the specifics of the case and therefore of being told of such a defense, he testified that it was his custom and practice to discuss and investigate possible defenses with his clients. Defendant also testified that he discussed various defenses with Lee, which Lee followed up on.
As argued by the People, it is of note that defendant did not assert the defense of medical impossibility, and Lee's alleged ineffectiveness in not presenting it, in defendant's appeal of his conviction on October 16, 2001, his pro se CPL 440 motion dated October 6, 2004, or his habeas corpus petition dated February 22, 2006. While Supreme Court acknowledged that it was "troubling that the issue was not raised in the habeas corpus application," it nevertheless dismissed the People's argument as disingenuous. The significance of defendant's failure to raise the issue for over 19 years is two-fold. First, had defendant raised the issue earlier, Lee's recollections as to what he did and did not do would certainly have been clearer. More importantly, Lee's case files would be available for review and scrutiny. Despite Supreme Court's recognition that "the loss of Lee's file makes it impossible to prove that" Lee was in possession of the medical records or was aware of the records, it nevertheless improvidently concluded that Lee "conducted no investigation" and "did not look for an expert or for the treating doctor to consult about the injury and its consequences."[FN1]
Assuming Lee was informed of the existence of such a defense, defendant failed to overcome a "presumption[*8]" that the challenged action "might be considered sound trial strategy," and demonstrate the "absence of strategic or other legitimate explanations" for the alleged shortcomings (see Honghirun, 29 NY3d at 289). In Honghirun, the defendant was found guilty of first-degree course of sexual conduct against a child. Testimony was elicited at trial that the child had previously revealed to a school counselor that the defendant had sexually abused her (id.). The defendant argued that counsel's failure to object to the testimony regarding the disclosures constituted ineffective assistance of counsel, as the failure to object could not be considered a matter of strategy (id.). The Court disagreed, holding that the defendant did not demonstrate the absence of strategic or legitimate explanations for counsel's failure to object. The Court reasoned that "counsel strategically chose to use the evidence to [the] defendant's advantage by exploring the substance of, and the circumstances surrounding, the disclosure" in order to "support the defense of recent fabrication" (id. at 290).
In People v Caban (5 NY3d at 143), the defendant was convicted of conspiracy to commit murder, based largely on the testimony of a prosecution witness who worked for the defendant in defendant's drug-selling operation. At defense counsel's request, the court submitted to the jury the factual question of whether the witness was an accomplice whose testimony required corroboration (id. at 152). The defendant argued that counsel was ineffective for failing to also request the court to charge that the witness was an accomplice as a matter of law (id.). The Court held that the "defendant failed to demonstrate the absence of strategic or other legitimate explanations for counsel's decision to request only that [the witness's] accomplice status be submitted to the jury as a question of fact" (id. at 154). According to the Court, had counsel requested the latter it would have potentially deprived counsel of the opportunity to submit even as a question of fact the issue of the witness's status as an accomplice to the conspiracy to murder (id.).
Similarly, in People v Hobot (84 NY2d 1021, 1024 [1995]), the Court of Appeals held that trial counsel's omission did not prejudice the defense or defendant's right to a fair trial. In Hobot, after a jury trial, the defendant was convicted of two counts of rape in the first degree and one count of sexual abuse in the first degree for the sexual abuse of the then nine-year-old daughter of a woman with whom the defendant lived (id. at 1022). Defense counsel vigorously cross-examined the People's medical expert regarding gynecological and other physical injuries sustained by the child (id. at 1023). In addition to attempts to establish that the child had a basis to fabricate, counsel attempted to establish an alibi defense (id.). Following conviction, it was learned that despite having been accepted as an expert in gynecology, the witness was actually [*9]a general practitioner who examined the child and was not qualified to opine as to sexual abuse (id. at 1024). In rejecting the defendant's argument of ineffective assistance of counsel, the trial court concluded that while counsel erred in not pursuing the qualifications of the witness, her testimony would still have been prejudicial to the defendant given her findings of injuries to the child's face and body (id.).
It is objectively reasonable to conclude that Lee considered the risks of putting forth the defense of medical impossibility and decided against it. Advancing such a defense may have required testimony by defendant as to his medical condition on the day of the shooting. Defendant would no doubt be required to testify to the circumstances under which he sustained the injury, i.e., that he was involved in a drug related shooting one year earlier. As a consequence, the jury may have learned of defendant's involvement in drug activity.
Moreover, defendant's physical condition at the time of the shooting would seem to conflict with his medical records and potential expert testimony. Simon opined that based upon his review of defendant's medical records, defendant's "foot drop" or "dropped foot" would impact his ability not only to run but also to engage in any sustained activity. According to Simon, the prognosis in 1998 was that defendant had "dropped foot" and would have to learn to live with it. Simon also opined that without a nerve graft, defendant would never walk normally again. However, defendant's own testimony established that he stopped physical therapy in January 1999 because he no longer suffered from drop foot; that he never had a nerve graft; and that five days after the shooting, he had no discernable limp but rather had a normal gait.
Viewed as a whole, Lee's choice of strategy — declining to present the medical defense — was a reasonable one (Strickland, 466 US at 690). At the heart of the defense is that defendant was misidentified by the witnesses in that he could not have been the shooter. Lee was able to present a defense of misidentification without subjecting the defense to the issues stated above. That defendant was convicted does not mean counsel was ineffective (see Benevento, 91 NY2d at 712).
At bottom, the evidence, the law, and the circumstances—viewed in their totality and from the perspective at the time of representation—demonstrate that Lee provided meaningful representation. Accordingly, the constitutional standard was met (Benevento, 91 NY2d at 708; People v Jackson, 52 NY2d 1027, 1028 [1981]).
Further, Supreme Court's conclusion that the medical evidence, including Simon's testimony, provided sufficient basis for the possibility of a different outcome more favorable to defendant was not supported by the record. While Supreme Court referred to Simon's testimony as unrefuted in determining the issue of ineffective assistance counsel, it disregarded the inconsistencies with not only defendant's [*10]own testimony but also that of Anthony Cleveland. Cleveland testified that he knew defendant, whom he knew as "Dre,'' from the neighborhood. He stated that in the months prior to the shooting, he saw defendant outside almost every day walking his dogs and that the two would play basketball together. According to Cleveland, in January 1999, defendant had a normal walk.
The record does not support the conclusion that given the deficiencies stated above, it was highly probable that Simon's testimony or that of any other medical expert would have been sufficient to defeat the testimony of three eyewitnesses, all of whom knew defendant, and none of whom had any apparent motivation to falsely identify him. Nor could Simon's testimony have defeated the evidence of witness intimidation against an independent eyewitness. Where, as in this case, the evidence of guilt was overwhelming, Lee cannot be faulted for creating a defense that does not exist (People v Robinson, 209 AD3d 505, 505-506 [1st Dept 2022], lv denied 39 NY3d 988 [2022], quoting People v DeFreitas, 213 AD2d 96, 101 [2d Dept 1995], lv denied 86 NY2d 872 [1995]).
Supreme Court substituted its own belief and evaluation and determined that the medical impossibility defense would have been defendant's "most viable defense" or could have "injected a quantum of reasonable doubt." This was clearly in error. "[C]ounsel's efforts should not be second-guessed with the clarity of hindsight to determine how the defense might have been more effective" (Benevento, 91 NY2d at 712; see e.g. Honghirun, 29 NY3d at 290). Newly Discovered Evidence
Supreme Court providently exercised its discretion in denying defendant's motion to vacate the judgment of conviction on the ground of newly discovered evidence. To vacate a judgment of conviction based on newly discovered evidence pursuant to CPL 440.10(1)(g),
"the evidence must fulfill all the following requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence" (People v Velazquez, 143 AD3d 126, 131 [1st Dept 2016], lv denied 28 NY3d 1189 [2017] [citations omitted]).
Here, the newly discovered evidence included the testimony of Jamel Graham that on January 11, 1999, he observed Shonda Tyrell, who fit the physical appearance of defendant at the time of the incident, shoot at drug dealers at the corner of White Plains Avenue and Britton Avenue. Graham would also apparently testify that on January 11th there was a drug "turf war" between marijuana dealers at the corner where the shooting occurred. Cleveland's testimony would be that he observed Tyrell, chasing Virgo with a gun held "upwards" and then, although [*11]he did not see Tyrell fire a gun, he heard four shots and saw Virgo lying on the ground.
Supreme Court properly weighed the evidence before it and found that the testimony of Graham and Cleveland failed as immaterial and false. The court found Cleveland's account of the January 15th shooting, identifying Tyrell as the shooter, to be unworthy of belief due to severe contradictions between his account of the crime and the trial evidence, including the ballistics evidence. The court also found Graham's testimony to be irrelevant because he conceded that he did not know whether Virgo was in the group that confronted him and Tyrell on January 11th.
While Supreme Court based its decision on the lack of materiality and truthfulness of Graham and Cleveland's testimony, it is clear that based upon the overwhelming evidence of guilt, including the identification by three eyewitnesses and significant evidence tying defendant to the shootings, defendant failed to satisfy his burden to show that the evidence relied upon would likely have changed the outcome of the trial (see Velazquez, 143 AD3d at 131). 
Actual Innocence
Supreme Court properly denied defendant's motion to vacate the judgment of conviction on the ground of actual innocence.
"To vacate a judgment based on actual innocence pursuant to CPL 440.10(h), defendant must demonstrate with clear and convincing evidence, which was not presented at trial, his factual innocence, i.e. that he was actually innocent of the crimes for which he was convicted" (Velazquez, 143 AD3d at 136 [citation omitted]).
"To be sufficient, clear and convincing evidence must establish that the claim asserted is 'highly probable.' Mere doubt as to the defendant's guilt, or a preponderance of conflicting evidence as to the defendant's guilt, is insufficient, since a convicted defendant no longer enjoys the presumption of innocence, and in fact is presumed to be guilty" (Velazquez, 143 AD3d at 136 [citation omitted]).
For the reasons stated above, the court disregarded the testimony of Graham and Cleveland. As to Simon, the court found that his testimony, while compelling and credible, did not rise to the level of high probability necessary for defendant to meet his burden to present clear and convincing evidence in support of his claim (see Velazquez, 143 AD3d at 136-137).
As noted by Supreme Court, there was a clear conflict in the testimony of defendant regarding his condition on the day of the shooting and Simon's opinion as to defendant's condition on that day as well as his lack of actual knowledge of defendant's recovery. This conflict prevented a finding that Simon's expert opinion made defendant's actual innocence claim highly probable (see id.)
Accordingly, the order of the Supreme Court, Bronx County (David L. Lewis, J.), entered on or about December 1, 2022, which [*12]based on ineffective assistance of counsel, granted defendant's motion pursuant to CPL 440.10(1)(h) to vacate his conviction, rendered June 8, 2000, after a jury trial (same court, Phyllis Skloot Bamberger, J.), of two counts of attempted murder in the second degree, and sentencing him to consecutive terms of 20 years, should be reversed, on the law, and the conviction reinstated. So much of same order as denied defendant's motion to vacate his conviction on the grounds of actual innocence and newly discovered evidence should be affirmed.
Order, Supreme Court, Bronx County (David L. Lewis, J.), entered on or about December 1, 2022, reversed, on the law, and the conviction reinstated. So much of same order as denied defendant's motion to vacate his conviction on the grounds of actual innocence and newly discovered evidence should be affirmed.
Opinion by Webber, J.P. All concur.
Webber, J.P., Kapnick, Kennedy, Scarpulla, Shulman, JJ.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: December 24, 2024

Footnotes

Footnote 1: The People argue that defendant's failure to assert the defense of medical impossibility suggests recent fabrication on the part of defendant. At the very least, it is curious that there is no explanation by defendant as to why he waited 19 years to assert a defense which he argues he was insistent should have been put forth since his arrest.