■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GARY THIBODEAU, Appellant. [56 NYS3d 669]—

Appeal, by permission of a Justice of the Appellate Division of the Supreme Court in the Fourth Judicial Department, from an order of the Oswego County Court (Daniel R. King, A.J.), dated March 2, 2016. The order denied the motion of defendant to vacate a judgment of conviction pursuant to CPL 440.10.

It is hereby ordered that the order so appealed from is affirmed.

Memorandum: Defendant appeals from an order denying, after a hearing, his CPL 440.10 motion seeking to vacate a judgment convicting him upon a jury verdict of kidnapping in the first degree (Penal Law § 135.25 [3]). Defendant's conviction arises from the April 3, 1994 abduction of the victim from the convenience store where she worked in the Town of New Haven. The victim has not been heard from since then, nor has her body been found. Defendant and his brother were jointly indicted for the kidnapping but were tried separately, and the People's theory of the case was that they had abducted the victim using a van owned by defendant's brother. Defendant was tried first, beginning in May 1995, and convicted. His brother was subsequently acquitted. We affirmed the judgment of conviction on defendant's direct appeal (*People v Thibodeau*, 267 AD2d 952 [1999], *lv denied* 95 NY2d 805 [2000]).

In February 2013, a woman named Tonya Priest gave a sworn statement to the police alleging that James Steen told her in 2006 that he, Roger Breckenridge, and Michael Bohrer had abducted the victim using a van, brought her to Breckenridge's residence, killed her, and disposed of her body and clothes at a nearby cabin. Steen also allegedly told Priest that Breckenridge's onetime girlfriend, Jennifer Wescott, had been present when they brought the victim to the residence. In March 2013, Priest placed a recorded telephone call to Wescott, and Wescott seemed to confirm that Steen, Breckenridge, and Bohrer had brought the victim to the residence in a van. Wescott, however, made other seemingly contradictory statements during the call, including that she had, in essence, surmised well after the fact that the victim had been the person in the van, and that, as far as she knew, defendant had killed the victim. When interviewed a few days after the call, Wescott told the police that she had lied to Priest, that she and

Breckenridge never lived where Steen allegedly said the victim had been taken, and that she did not have any relevant information about the case. Megan Shaw, who was married to Priest's former husband and had discussed the case with Priest, gave her own statement to the police in 2013 alleging that Steen told her in early 2010 that he had helped dispose of the victim's body after she was killed by members of a motorcycle club.

In 2014, defendant's appellate counsel reviewed the file kept by the trial attorney for defendant's brother and found documents concerning the victim's status as a confidential informant (CI) for the police. Those documents established that a deputy had lost the victim's "CI file," which included her personal information and a photograph, in late 1991 in the parking lot of the same store from which she was abducted in 1994, that another deputy had recovered the file about a month later, and that an investigator had located it in storage about a week before defendant's trial began. Defendant's trial counsel asserted in an affidavit that he had not seen those documents or the CI file itself (collectively, CI information), and that he could have used the CI information at trial to establish that other people had a motive to harm the victim.

Defendant moved in July 2014 to vacate the judgment of conviction based on the People's alleged *Brady* violation in failing to disclose the CI information (*see* CPL 440.10 [1] [h]), and based on newly discovered evidence (*see* CPL 440.10 [1] [g]). Defendant also contended in his reply papers that he was actually innocent. County Court conducted a hearing on the motion.

With respect to the *Brady* claim, defendant's trial counsel testified that he had not seen any of the CI information. The trial prosecutor, by contrast, testified that the deputies' reports concerning the victim's status as a CI and the loss of her file had been made available to the defense in December 1994, and that the investigator's report and CI file had been disclosed the day after the investigator found the file in storage.

With respect to the newly discovered evidence claim, Priest's 2013 statement and a transcript of her recorded call to Wescott were admitted in evidence, but defendant declined to call Priest as a witness at the hearing. Shaw testified consistent with her 2013 statement, and defendant called several other witnesses to testify to admissions allegedly made by Steen, Breckenridge, and Bohrer. In some of the alleged admissions, the declarant described participating in the disposal of the victim's body. In others, the declarant said that he had done something to the

victim without specifying what he had done, e.g., "I'll do you as I did [the victim]," and "I will never see a day in prison for what we did to [the victim]." In the remaining alleged admissions, the declarant said things to the effect that defendant did not commit the crime or that the victim would not be found, but did not directly connect himself to her disappearance.

Defendant also presented the testimony of William Pierce, who testified that he saw a man strike a woman in the head near a van at the store on April 3, 1994, and that he believed, after seeing a photograph of Steen in the newspaper, that Steen was the man he saw. Pierce further testified that the van he saw was not the van owned by defendant's brother. Pierce admitted, however, that he had not reported his observations at any time prior to July 2014, that even then he had initially believed that defendant was the man he saw, and that he had been shown a photo array containing a photograph of Steen from 1988 and was unable to identify him. Pierce had also estimated that the man he saw was 35 to 45 years old. Defendant was 40 years old in April 1994, and Steen was 23.

Steen, who was sentenced to life in prison without parole in 2011 for killing his wife and his cousin in September 2010 (*People v Steen*, 107 AD3d 1608 [2013], *lv denied* 22 NY3d 959 [2013]), testified at the hearing, as did Breckenridge and Bohrer. They each denied abducting the victim or making the admissions attributed to them, and Steen and Breckenridge further testified that they did not know Bohrer in 1994. Wescott testified that she did not know anything about the crime, and that she was 17 years old in April 1994 and did not meet Breckenridge until later that year. There was testimony at the hearing that Priest "always wanted to be the center of attention," and that the police did not think she was credible in light of "discrepancies in her story" and attempts on her part to link the death of her second husband in 2010 to the abduction of the victim; that Breckenridge was likewise known as "a talker" and "an attention getter" who was not to be taken seriously; that Bohrer was mentally unstable and obsessed with the case; and that the motorcycle club referenced in Shaw's testimony did not exist until 2000.

The court denied defendant's motion, concluding, inter alia, that the CI information had been disclosed to his attorney, that the alleged third-party admissions were inadmissible hearsay rather than declarations against penal interest, and that Pierce's testimony was not credible. The court did not specifically address defendant's actual innocence claim.

We reject defendant's contention that the court erred in deny-

ing that part of his motion alleging a *Brady* violation. The record supports the court's determination that defendant failed to establish that the CI information was suppressed by the People (*see People v Carrasquillo-Fuentes*, 142 AD3d 1335, 1339 [2016], *lv denied* 28 NY3d 1143 [2017]; *People v Ulrich*, 265 AD2d 884, 884-885 [1999], *lv denied* 94 NY2d 799 [1999]; *see generally* CPL 440.30 [6]; *People v Fuentes*, 12 NY3d 259, 263 [2009], *rearg denied* 13 NY3d 766 [2009]). The conflicting testimony of defendant's trial counsel and the trial prosecutor with respect to whether the CI information was disclosed, as well as the competing inferences to be drawn from documentary and other evidence bearing on the issue, presented an issue of credibility that the court was entitled to resolve in favor of the People (*see People v Cox*, 297 AD2d 589, 589 [2002], *lv denied* 99 NY2d 557 [2002]; *see generally People v Campbell*, 106 AD3d 1507, 1508 [2013], *lv denied* 21 NY3d 1002 [2013]). In view of our determination, we do not address the court's alternative grounds for rejecting defendant's *Brady* claim.

We also reject defendant's contention that the court erred in denying that part of his motion alleging newly discovered evidence. The decision whether to vacate a judgment of conviction based on newly discovered evidence is addressed to the sound discretion of the motion court (*see People v Backus*, 129 AD3d 1621, 1623-1624 [2015], *lv denied* 27 NY3d 991 [2016]; *People v Deacon*, 96 AD3d 965, 967 [2012], *appeal dismissed* 20 NY3d 1046 [2013]), and "[i]mplicit in [this] ground for [vacatur] is that the newly discovered evidence be admissible" (*People v Tankleff*, 49 AD3d 160, 182 [2007] [internal quotation marks omitted]; *see Backus*, 129 AD3d at 1624).

First, we conclude that the court was entitled to determine, in view of the circumstances of Pierce's identification of Steen, that his testimony was simply not credible (*see People v Jimenez*, 142 AD3d 149, 157 [2016]; *People v Britton*, 49 AD3d 893, 894 [2008], *lv denied* 10 NY3d 956 [2008]; *People v Watson*, 152 AD2d 954, 955 [1989], *lv denied* 74 NY2d 900 [1989]). A hearing court's credibility determinations are "entitled to great weight" in light of its opportunity to see the witnesses, hear the testimony, and observe demeanor (*People v Smith*, 16 AD3d 1081, 1082 [2005], *lv denied* 4 NY3d 891 [2005]; *see People v Hincapie*, 142 AD3d 886, 886 [2016]; *see generally People v Bleakley*, 69 NY2d 490, 495 [1987]), and we do not agree with the dissent that Pierce's testimony presents an appropriate situation for us to substitute our own credibility determination for that of the hearing court (*cf. Tankleff*, 49 AD3d at 178-179).

Next, we conclude that the court properly determined that

all of the alleged third-party admissions were hearsay not within any of the exceptions to the hearsay rule and were therefore inadmissible (*see generally People v Brensic*, 70 NY2d 9, 14 [1987], *remittitur amended* 70 NY2d 722 [1987]; *People v Meadow*, 140 AD3d 1596, 1598 [2016], *lv denied* 28 NY3d 933 [2016], *denied reconsideration* 28 NY3d 972 [2016]). The hearsay exception for declarations against penal interest applies where (1) the declarant is unavailable to testify; (2) the declarant was aware when making the declaration that it was contrary to his or her penal interest; (3) the declarant had competent knowledge of the relevant facts; and (4) there is "sufficient competent evidence independent of the declaration to assure its trustworthiness and reliability" (*Brensic*, 70 NY2d at 15; *see People v Shortridge*, 65 NY2d 309, 312 [1985]; *People v Settles*, 46 NY2d 154, 167 [1978]). "The fourth factor is the 'most important' aspect of the exception" (*People v Shabazz*, 22 NY3d 896, 898 [2013]). Where a declaration is offered to exculpate the defendant, the standard of admissibility is "more lenient," and " '[s]upportive evidence is sufficient if it establishes a reasonable possibility that the statement might be true' " (*People v Soto*, 26 NY3d 455, 462 [2015]; *see People v Pierre*, 129 AD3d 1490, 1492 [2015]; *Deacon*, 96 AD3d at 968).

Even assuming, arguendo, that the willingness of Steen, Breckenridge, Bohrer, and Wescott to testify at the motion hearing does not preclude the applicability of the exception for declarations against penal interest (*see People v Oxley*, 64 AD3d 1078, 1083-1084 [2009], *lv denied* 13 NY3d 941 [2010]; *cf. People v Sanchez*, 95 AD3d 241, 247-248 [2012], *affd* 21 NY3d 216 [2013]), we conclude that the exception is inapplicable. Several of the alleged admissions did not contain enough incriminating detail to show that the declarant was knowingly speaking against his or her penal interest (*see generally People v Castor*, 99 AD3d 1177, 1180-1181 [2012], *lv denied* 20 NY3d 1010 [2013]), or that he or she had competent knowledge of the underlying facts. More significantly, defendant failed to establish that the alleged admissions were reliable (*see People v Velazquez*, 143 AD3d 126, 135 [2016], *lv denied* 28 NY3d 1189 [2017]; *People v Bedi*, 299 AD2d 556, 556 [2002], *lv denied* 99 NY2d 612 [2003]; *People v Wallace*, 270 AD2d 823, 824 [2000], *lv denied* 95 NY2d 806 [2000]).

Wescott's statements in the recorded call, in particular, made little sense on their face, and she recanted them shortly thereafter (*see People v Buari*, 50 AD3d 483, 484 [2008], *lv denied* 11 NY3d 735 [2008]; *People v Pugh*, 236 AD2d 810, 811 [1997], *lv denied* 89 NY2d 1099 [1997]; *cf. People v Bellamy*, 84 AD3d

1260, 1261-1262 [2011], *lv denied* 17 NY3d 813 [2011]). Even assuming, arguendo, that the court could have reasonably concluded that Wescott truthfully implicated Steen, Breckenridge, and Bohrer in her statements to Priest and then testified falsely at the hearing in an attempt to avoid the consequences of those statements, we conclude that the court was entitled to instead resolve the issue of Wescott's credibility in favor of the People, thereby concluding that her hearing testimony was credible and her initial statements to Priest were not (*see generally Smith*, 16 AD3d at 1082). Unlike our dissenting colleague, we do not believe that Wescott's statements to Priest "bore persuasive assurances of trustworthiness" that would render them admissible despite their hearsay nature (*Chambers v Mississippi*, 410 US 284, 302 [1973]).

Apart from Pierce's testimony, which we have concluded that the court properly discredited, there was no evidence independent of the alleged admissions that tended to link Steen, Breckenridge, or Bohrer to the crime (*cf. People v DiPippo*, 27 NY3d 127, 137-140 [2016]; *Oxley*, 64 AD3d at 1082). Moreover, most of defendant's witnesses came forward only after the case attracted renewed media attention in 2014 (*cf. Tankleff*, 49 AD3d at 181-182); most of the alleged admissions were made long after the crime and defendant's conviction (*see generally Shortridge*, 65 NY2d at 313); many of them were inconsistent with each other (*see People v Feliciano*, 240 AD2d 256, 257 [1997], *lv denied* 90 NY2d 1011 [1997]; *People v Nicholson*, 108 AD2d 929, 930 [1985]; *cf. DiPippo*, 27 NY3d at 138); and, as described above, the hearing testimony cast significant doubt on the credibility of at least Priest, Breckenridge, and Bohrer (*see People v Penoyer*, 135 AD2d 42, 44-45 [1988], *affd* 72 NY2d 936 [1988]; *People v Thompson*, 148 AD2d 763, 764 [1989], *lv denied* 74 NY2d 748 [1989]; *see generally Shortridge*, 65 NY2d at 313). "[T]here is no rule requiring the automatic admission of any hearsay statement" (*People v Hayes*, 17 NY3d 46, 53 [2011], *cert denied* 565 US 1095 [2011]), and " '[c]orroboration of a hearsay declaration is not furnished by merely producing additional hearsay testimony' " with no indicia of reliability (*Matter of Comstock v Goetz Oil Corp.*, 11 AD2d 847, 847 [1960]; *cf. Chambers*, 410 US 284 at 300-301). Although defendant presented evidence that trained dogs detected the possible presence of human remains near a "collapsed structure" in the general area where Steen allegedly told Priest the victim's body was buried, no remains were actually found there, and we conclude that the evidence regarding the dogs is too equivocal on its own to show a reasonable possibility that Steen's alleged admission to Priest might be true.

In our view, the alleged weaknesses in the People's trial proof identified by the dissent do not tend to establish that the alleged admissions were reliable. In any event, we conclude that there was compelling circumstantial evidence at trial placing defendant at the store on the morning of the crime. It is undisputed that defendant's brother was there, and, whereas defendant testified at trial that he was not in his brother's company that morning or the previous night, the People presented testimony that defendant and his brother were together at a bar the night before the crime and the van owned by defendant's brother was at defendant's home shortly after the crime was committed. As the hearing court noted, there is no comparable evidence concerning Steen, Breckenridge, or Bohrer.

In view of the inadmissibility of the alleged third-party admissions, we conclude that the court properly determined that the newly discovered evidence was not "of such character as to create a probability that" the verdict would have been more favorable to defendant if it had been received at trial (CPL 440.10 [1] [g]; *see Backus*, 129 AD3d at 1624-1625; *Bedi*, 299 AD2d at 556; *People v Jones* [appeal No. 1], 256 AD2d 1172, 1172 [1998], *lv denied* 93 NY2d 972 [1999]; *cf. People v Wong*, 11 AD3d 724, 725-727 [2004]).

The remaining evidentiary rulings challenged by defendant did not violate his right to present a defense. Evidence of other crimes committed by Bohrer was not admissible as "reverse *Molineux*" evidence on the issue of identity (*DiPippo*, 27 NY3d at 138), because those crimes were not similar enough to the abduction of the victim to establish a distinctive modus operandi (*see People v Littlejohn*, 112 AD3d 67, 76-77 [2013], *lv denied* 22 NY3d 1140 [2014]; *cf. DiPippo*, 27 NY3d at 139-141). Furthermore, even assuming, arguendo, that "a more relaxed standard" of admissibility governs when a defendant seeks to introduce evidence of other crimes committed by a third party (*DiPippo*, 27 NY3d at 139; *see e.g. State v Garfole*, 76 NJ 445, 452-453, 388 A2d 587, 591 [1978]), we conclude that the other crimes allegedly committed by Bohrer were too remote from and dissimilar to the instant crime to be relevant to defendant's guilt or innocence (*see People v Schulz*, 4 NY3d 521, 528-529 [2005]; *People v Willock*, 125 AD3d 901, 902-903 [2015], *lv denied* 26 NY3d 1012 [2015]; *People v Clarkson*, 78 AD3d 1573, 1573-1574 [2010], *lv denied* 16 NY3d 829 [2011]; *see generally Garfole*, 76 NJ at 452-453, 388 A2d at 591). The rest of the evidence in question was properly excluded as speculative (*see People v Gamble*, 18 NY3d 386, 398-399 [2012], *rearg denied*

19 NY3d 833 [2012]; *People v Johnson*, 109 AD3d 1187, 1187-1188 [2013], *lv denied* 22 NY3d 1041 [2013]), or of no more than marginal relevance to the issues at the hearing (*see People v Black*, 90 AD3d 1066, 1067 [2011], *lv denied* 18 NY3d 992 [2012]; *see also People v Williams*, 94 AD3d 1555, 1556-1557 [2012]).

Finally, we reject defendant's contention that the court erred in "failing to address and grant his actual innocence claim." Given the respective standards of proof for a newly discovered evidence claim and an actual innocence claim (*compare People v Hamilton*, 115 AD3d 12, 24-27 [2014], *with* CPL 440.10 [1] [g]; 440.30 [6]), new evidence that is insufficient to create a probability of a more favorable verdict warranting a new trial logically cannot establish a meritorious claim of actual innocence. We thus conclude that the court's rejection of defendant's newly discovered evidence claim, which is supported by the record, constituted an implicit rejection of his actual innocence claim as well (*cf. People v Chattley*, 89 AD3d 1557, 1558 [2011]), and we affirm the order.

All concur except Centra, J., who dissents and votes to reverse in the following memorandum.

Centra, J. (dissenting). I respectfully dissent. I agree with the majority that County Court properly rejected that part of defendant's motion alleging a *Brady* violation inasmuch as defendant did not meet his burden of establishing that the alleged *Brady* material was suppressed by the People. I further agree with the majority that the court properly precluded defendant from introducing certain evidence that did not involve third-party admissions. I also agree with the majority that defendant failed to establish his entitlement to relief through an actual innocence claim (*see People v Deacon*, 96 AD3d 965, 970 [2012], *appeal dismissed* 20 NY3d 1046 [2013]). I agree with defendant, however, that he established his entitlement to a new trial based on newly discovered evidence. I would therefore reverse the order, grant the motion, vacate the judgment of conviction, and grant a new trial.

Eighteen-year-old Heidi Allen was working alone at a gas station convenience store on Easter morning, April 3, 1994, when she went missing. Heidi was never found and is presumed dead. In August 1994, defendant and his brother, Richard Thibodeau (Richard), were charged with her kidnapping. After separate jury trials, defendant was convicted of kidnapping in the first degree (Penal Law § 135.25 [3]) and sentenced to an indeterminate term of 25 years to life, and he remains incarcerated. Richard was acquitted.

## Trial Evidence

At the trial, the owner of the store, which was at the corner of Route 104 and 104B in the Town of New Haven, testified that the last transaction at the store as reflected on the cash register receipt was the purchase of two packs of cigarettes at 7:42 a.m., and no money was missing from the register. Richard was the customer who made that purchase. There was a purchase at 7:41 a.m. of a pack of cigarettes and two newspapers, which was confirmed by the testimony of that customer. He testified that he arrived at the store after passing a slow-moving van that he identified as a van that belonged to Richard. Richard's GMC van was distinctive in appearance; it was a large white van with black doors on the sides and back, a black stripe down the side, and rust in spots. The customer made his purchase, testifying that there was no one else inside the store besides the clerk.

As the customer was exiting the store, he saw a man who was about five feet six inches or seven inches tall, weighed about 145 pounds, and had a mustache and wore a baseball cap. An investigator testified that Richard was five feet seven inches tall, weighed approximately 155 pounds, and had grey hair and a mustache, so the description given by the customer matched that of Richard, and in fact the customer testified that it looked like Richard. The man was standing outside next to the driver's side of that same van the customer had passed, which was parked "about parallel" in front of the store and was running. They walked past each other as the man proceeded to the store and the customer walked toward his vehicle. After the customer entered his vehicle and pulled forward, he saw the van move forward as well, three or four feet toward the front double doors, with the passenger side of the van closest to the doors. Both vehicles stopped, and the customer then drove around the van and saw it move forward again. The People contend that this showed that someone else was in the van while Richard was in the store. However, the cash register receipt showed that Richard made his purchase just one minute after this customer, and the customer testified that he entered his vehicle and opened a pack of cigarettes before moving his vehicle. It therefore could have been simply Richard who entered the van and started moving it.

Another customer testified that he pulled into the convenience store parking lot at approximately 7:41 a.m. and did not see anyone in the lot. He went inside the store to buy a newspaper but no one was there. After waiting a few minutes and looking around the store, he went outside and flagged down a passing sheriff's deputy who was stopped at the intersection.

The deputy testified that he was flagged down at approximately 7:45 a.m. He spoke with the customer and then notified dispatch of suspicious activity at 7:55 a.m. Based on the times stamped on the cash register receipt, the clock on the cash register having been verified by the police, and the time recorded on the police dispatch, there was a very short window of time between 7:42 a.m. and 7:55 a.m. when Heidi was abducted. The time period was even shorter considering that the customer who flagged down the deputy spent a few minutes waiting inside the store, and a couple more minutes passed while the deputy spoke with the customer before notifying dispatch. The deputy found no signs of a struggle inside the store. The front door was unlocked, but the other doors were secured.

Five days after Heidi's disappearance, Christopher Bivens, who does vehicle autobody repair, contacted the police about observations he had made on April 3, 1994, i.e., he saw two men and a woman arguing outside the store. He could not describe them or any vehicles that were present. He thought that there was a van there but he was not sure. The police interviewed Bivens on April 18th, and he said that the van was light blue with dark trim but could not say whether it had pinstripes. He admitted that the police drove him past Richard's van on April 20th, and he told them that the van was the right style but the wrong color. The following day, the police showed him a photograph of Richard's van showing the passenger side and back doors, and the witness did not think that was the van, either. He was shown a second photograph of Richard's van showing the black side doors, and he was now 80% certain that was the van. When shown another photograph of Richard's van the next day, the witness now said that he was positive it was Richard's van that he saw the morning of Heidi's disappearance because he recognized the rust spot over the rear wheel and the trailer hitch.

At trial, Bivens testified that, as he approached the store at approximately 30 miles per hour, he saw two white males and a white female outside the store, and the man closest to the store was holding the "struggling" female in a bear hug. Bivens described this man as "strong" and "husky." The other man was older and was walking toward a van that the witness identified as Richard's van. He said that the stripe on the van caught his attention because it was not ordinary to have it there and must have been painted on. He also noted the rust on the van, which, as an autobody repairman, he spotted all the time. Bivens told the police that both men appeared to be five feet eleven inches

tall, husky, and between 30 and 40 years old. A police investigator described defendant as being five feet ten inches tall and weighing 180 to 190 pounds, with dark brown hair and a mustache. Defendant testified at trial and described himself as being five feet eight inches or nine inches tall and weighing 150 to 160 pounds. Bivens testified that the man holding the woman was a few inches taller than her. Heidi's boyfriend described her as five feet ten inches tall with dirty blonde hair.

Nancy Fabian testified that she left her house on Easter morning and arrived in the Village of Mexico at around 7:45 a.m. When she turned on Route 104, a van came up very fast behind her and was only two or three feet away. The van, which she identified as belonging to Richard, was swerving back and forth. A white male with dark hair and a "scruffy face," like with a beard and mustache, was driving and was using his right arm to try to "control something in the back of the van or push something down." Fabian reported what she observed to the police in early June and said that the van was light blue, which Richard's van is not. She also knew that there was something on the middle of the van, but was not sure if it was a stripe. The police then showed her Richard's van, and she made a positive identification.

Defendant testified that he and his girlfriend went to a friend's house the night before Easter and stayed past midnight, then went straight home and remained there until they were awakened by Richard's phone call shortly after 10:00 a.m. He denied seeing Richard on April 3, 1994. Some witnesses at trial corroborated his testimony, while others contradicted it. A bartender testified that defendant and Richard were at a bar drinking together the night before Heidi disappeared, and they left the bar between 12:00 and 12:30 a.m.

One of defendant's neighbors testified that he drove past defendant's house on Easter morning around 7:30 a.m. and saw tire tracks coming out of the driveway from the inch of wet snow they had, and there were no vehicles in the driveway. When he was pulling into a gas station, he saw Richard's van as he approached an intersection with Route 104. The neighbor then returned home and saw Richard's van and two other vehicles in defendant's driveway. When the neighbor contacted the police two months after the incident, he did not tell them that he saw Richard's van at an intersection; he did not remember seeing that until almost a year after the incident. The neighbor's son testified that he heard yelling and screaming between a man and a woman from defendant's house

around 10:45 a.m. on Easter that lasted about a half hour. His 14-year-old brother also heard the yelling.

Another neighbor, who was 13 years old at the time of her testimony, testified that she saw Richard's van in defendant's driveway on Easter morning at around 7:50 a.m. She did not tell anyone about the van until 13 months after Heidi disappeared. Another neighbor and his wife testified that, around 9:00 a.m. on Easter morning, they saw a van resembling Richard's van parked on the road at the end of defendant's driveway. They saw defendant standing outside the van talking to a man with grey hair on the passenger side of the van. They did not report this to the police until seven months after Heidi disappeared, even though they gave other statements to the police on earlier occasions.

On the other hand, two other neighbors testified that they never observed a van at defendant's residence on Easter morning, and never heard any loud voices. Richard's girlfriend testified that Richard left their residence around 7:30 a.m. and returned around 7:50 a.m. with two packs of cigarettes. They left their house around 8:30 a.m. to go to her grandparents' house. The girlfriend's relatives testified that Richard arrived at the grandparents' residence around 8:45 a.m. or 9:00 a.m. that morning. Two of Richard's neighbors testified that they saw his van parked in his own driveway between 8:15 a.m. and 8:45 a.m. Three other witnesses confirmed that they saw Richard's van headed toward the grandparents' residence around 8:45 a.m. Defendant's girlfriend corroborated his testimony about being inside his residence on Easter and not seeing Richard that day.

Richard and his girlfriend testified that, after they saw something on the television while they were at the grandparents' house, Richard called the police shortly after 10:00 a.m. to let them know he was at the store that morning, and also called defendant. The police went to the grandparents' residence, saw Richard's van in the driveway, and took a statement from Richard, who was cooperative and showed the packs of cigarettes that he had purchased. On April 9th, Richard consented to a search of his van. Prints were lifted from the van, but none was a match with Heidi. In addition, the van, which the police described as cluttered, was vacuumed and the material was sent to the FBI for processing; nothing matched Heidi. A forensic scientist testified that, if there was a struggle involved, it was more likely that there would be some sort of transfer. An investigator took impressions from tire marks left in the front of the store, which he believed looked like an ac-

celeration mark, like "if somebody was leaving the store in a hurry." The impressions from Richard's van did not match.

The other evidence admitted at trial included the testimony of Heidi's boyfriend, who testified that he met defendant about five months before Heidi disappeared, and the boyfriend and Heidi saw defendant about four or five times at a bar or bowling alley during that five-month period. Defendant knew Heidi by name and commented to the boyfriend that he "had an attractive girlfriend." Defendant admitted that he met Heidi on a couple of occasions.

Finally, the evidence at the trial included the testimony of two inmates. Defendant was incarcerated in Massachusetts in June 1994, where he was held in the same block as Robert Baldasaro and James McDonald, both of whom testified at trial that defendant implicated himself in Heidi's kidnapping. Defendant testified that he would speak with Richard and his girlfriend over the phone while in jail, and they would give him updates on the investigation, which defendant would then discuss with the two inmates. Baldasaro testified that defendant, while not admitting his involvement in Heidi's disappearance, told him that he knew she was dead and no one would find her. He also said that there was no struggle at the store so she must have known the person with whom she left. Baldasaro further testified that defendant said that he and Richard went to speak with Heidi regarding a disagreement over a drug deal, they drove her by the woods near defendant's house to talk to her, and then Richard drove Heidi back to the store. When Richard returned to the store to get cigarettes, no one was at the store. Baldasaro asked defendant how she died, and defendant responded that her head had been bashed in with a shovel. McDonald testified that he was in the cell with Baldasaro and heard defendant say that he went to the store in Richard's van, that Heidi was killed with his shovel, and that they would never find her.

Defendant was convicted as charged, and we affirmed the judgment of conviction on appeal (*People v Thibodeau*, 267 AD2d 952 [1999], *lv denied* 95 NY2d 805 [2000]).

### CPL 440 Motion and Hearing

On July 30, 2014, defendant moved to vacate the judgment pursuant to CPL 440.10 (1) (b) and (h) on the ground that the People withheld *Brady* material and thus engaged in misrepresentation or fraud, and pursuant to CPL 440.10 (1) (g) on the ground of newly discovered evidence. The *Brady* material involved the fact that Heidi was a confidential informant for the police, a fact of which defendant was allegedly not aware

until after the trial. As stated at the outset, I agree with the majority that there was no *Brady* violation. The newly discovered evidence was based upon a police interview in early 2013 with Tonya Priest in which she disclosed that, in 2006, James Steen told her that he, Roger Breckenridge, and Michael Bohrer had abducted Heidi. After that, the police recorded a conversation between Priest and Jennifer Wescott, who was 17 years old at the time Heidi disappeared and had been Breckenridge's girlfriend for years thereafter. Wescott made various statements regarding Heidi's abduction but never implicated herself in the kidnapping. The police thereafter interviewed Wescott on two occasions. In addition, the defense proferred the statements of numerous witnesses implicating Steen, Breckenridge, and/or Bohrer in Heidi's disappearance.

The court held a hearing on the motion. William Pierce testified that he was stopped at an intersection in front of the store on Easter morning in 1994 and saw a man between 35 and 45 years old, husky, and with a beard strike a woman in the back of the head near a white van with a lot of rust on the side. The woman's hair appeared dark; not black, but not real light, either. Someone inside the van opened the side door and the man outside the van grabbed the woman and started toward the door. Pierce kept driving. He had believed that this man was defendant after drawing a beard on a picture of defendant, thought it looked "close enough," and figured that the police knew more than he did, so he never contacted the police. In July 2014, Pierce saw renewed news coverage of Heidi's case and a statement by the sheriff that one thing that bothered him in his career was Heidi's case. Pierce decided to come forward and report what he saw, and he confirmed with the police that defendant was the right person in custody. However, after seeing a picture in the newspaper about 10 days later of Steen with a full beard and mustache, Pierce realized that it had actually been Steen who he had seen striking the woman. This photo of Steen was taken at the time of an arrest in 2010. Pierce also testified that the van he saw was not Richard's van. The police showed Pierce a picture of Steen from 1988 in which he did not have a beard, and Pierce was not able to identify him.

The parties agreed to allow witnesses to testify regarding alleged third-party admissions by Steen, Breckenridge, and Bohrer, and the court would reserve decision on the ultimate admissibility of those statements. The parties also consented to Priest's statement being allowed into evidence. Priest stated that, in 2006, Steen told her that he, Breckenridge, and Bohrer

drove Bohrer's white van to the store, Steen grabbed Heidi from behind the counter, and Breckenridge assisted Steen in taking Heidi out the side door of the store. Steen had Heidi in a bear hug, got her in the van, and they "flew out of there like a bat out of hell." They took Heidi to Breckenridge's garage on Rice Road, where they beat her up because she threatened to report a drug deal. Steen said that Wescott was at the residence and was upset with them for bringing Heidi there. They then took her into the woods to a cabin, cut her up, and placed her body under the floor. The cabin was through thick woods, across railroad tracks, and through another spot of thick brush. In the opening following the thick brush, there was a small cabin with a wood stove. Steen said that Breckenridge and Wescott moved to Florida because the authorities were searching behind Breckenridge's house, and defendant was implicated only because he had a white van. Priest knew that Bohrer had a big white van at the time of Heidi's disappearance.

Megan Shaw testified that, in 2010, Steen told her that he disposed of Heidi's body. While not admitting his involvement in her abduction or killing, he said that he helped others dispose of her body in a cabin in the woods. Ronald Clarke testified that, a few years after defendant's trial, Steen told him that Heidi had "gone to Canada" and that defendant and Richard were not involved. Steen did not say that he abducted or killed Heidi.

Amanda Braley testified that, in 2003, when she was with Breckenridge and Wescott, someone mentioned Heidi's name, and Breckenridge laughed and said "he took that bitch to the scrap yard in the van, they had it crushed, and that she was shipped to Canada." Breckenridge then pointed to the sky and said, "See you, bye." Wescott was "irritated" and backhanded Breckenridge and said, "You shouldn't be talking about that s. . ., Rog," to which Breckenridge responded, "What, Jen, it's done and over with, and besides, nobody's ever going to find her." Around that same time period, something came on the television about Heidi, and Breckenridge laughed and looked at Wescott, prompting Wescott to say, "Don't look at me Rog, I didn't have anything to do with it. I only took the van to Murtaugh's." Braley further testified that, in 2006 or 2007, Steen made a comment that he was not afraid to go to jail, then paused and said, "I can, however, tell you I will never see a day in prison for what we did to Heidi."

Christopher Combes testified that, in the early 2000's, Breckenridge mentioned Heidi and told him that "[w]e chopped her up, we put her in a wood stove and put her in a vehicle and

sent her to Canada." Combes did not believe Breckenridge. Jessica Howard testified that Breckenridge said on several occasions that Heidi was killed for being "a rat" with regard to drugs, but he never said that he killed her or knew where her body was buried, just that she would not be found. Joe Mannino, one of Steen's fellow inmates, testified that Steen told him that defendant and Richard had nothing to do with Heidi's kidnapping and that he hauled the van used in Heidi's kidnapping to Canada and scrapped it. He told Mannino that Heidi was "a rat," but he never said that he abducted or killed Heidi.

The police recorded a phone call on March 2, 2013 between Priest and Wescott. Priest told Wescott what Steen had told her, i.e., that they took Bohrer's van to the store and then "brought her to [Wescott's] house" and Wescott "flip[ped] out." Wescott responded that "in [her] own head" she "dropped that s. . . . . . about ten years ago . . . but it took me a while." Later, Priest asked Wescott if she even knew it was Heidi they had brought there, and Wescott said no, that "they didn't even bring her in the house, they made her sit in the van." However, she "put two and two together" and later knew it was Heidi. When Priest asked who actually killed her, Wescott said that she had no idea, that it did not happen around her. Wescott said that it "bother[ed] her to talk about it" and, at the time it happened, she could not say anything to anybody because she was scared of all of them. Wescott said that the police "swarmed Grandma Breckenridge's house," and she agreed with Priest that was why she and Breckenridge moved to Florida. She said that she never thought about turning in Breckenridge; she "would never open a can of worms like that," she was "not doing the investigator's job," and they would just laugh in her face and say somebody has already been convicted.

Wescott testified at the hearing that she gave a statement to the police in March 2013 and again in August 2014. Before she gave her first statement, she texted Priest and asked if she was a cop. She also sent a text message to Richard Murtaugh, who runs a junkyard where Breckenridge used to work. After Wescott's first statement to the police, Breckenridge, who was incarcerated, sent a message to her to keep her mouth shut about the Heidi case. Wescott told the police during her first interview, before she knew that the call with Priest had been monitored by the police, that she asked Priest "what the hell are you talking about," and told Priest that she was crazy when Priest asked her about Heidi's disappearance, but in fact Wescott made no such statements during that recorded conversation. She also told the police that she did not say

anything to Priest about a van being brought to her house with a girl in it, but in fact she did. Wescott testified that she told "a lot of lies" to Priest. If she told Priest that Heidi was in the van, she did so only to "shut [Priest] up." Wescott testified that she did not meet Breckenridge until the summer of 1994 and met Bohrer in 2007. A witness, however, testified that he saw Wescott and Breckenridge together in 1991 or 1992. In addition, in her first statement to the police, Wescott gave an alibi for Breckenridge on the Easter morning that Heidi disappeared, i.e., he was with her.

Wescott told the police that she did not know what happened to Heidi, that she would have known if Steen, Breckenridge, and Bohrer had done anything, and that she would have come forward if she knew anything. However, she admitted texting someone that she gave a false statement in connection with the investigation. In her August 2014 statement to the police, Wescott said that Breckenridge told her in 1995 that all he knew was that Heidi was burned in a wood stove and taken care of in a van, but he did not explain how he knew that information.

Wescott denied ever living on Rice Road. A witness testified that her father owned property on Rice Road and rented out a trailer on it to Wescott's family in 1993 or 1994. Another witness, however, testified that she lived on that property from 1993 until 1996. A collapsed cabin was located off of Rice Road beyond a heavily wooded area, but not near railroad tracks, and there was no wood stove there. The Medical Examiner conducted a forensic examination of the site in July 2014 after a cadaver dog had indicated at a particular location; the examination found nothing of significance. In October 2014, two other cadaver dogs detected a scent of human remains at the area.

Steen, who is incarcerated for murdering his wife and his cousin in September 2010 (*People v Steen*, 107 AD3d 1608 [2013], *lv denied* 22 NY3d 959 [2013]), testified that he hauled scrap for Murtaugh in 1994, sometimes to Canada. Steen knew Breckenridge and Wescott in 1994. Breckenridge told him that Steen had hauled a van to Canada that had Heidi's remains in it, but Steen believed that Breckenridge was full of "hot air." Steen testified that, "[k]nowingly, [he] had nothing to do with any of this Heidi Allen stuff." Steen said that he was not a snitch and, if he knew who kidnapped Heidi, he would not tell, but he did not know. Steen denied discussing Heidi's disappearance with Priest and denied telling Shaw that he had disposed of Heidi's body.

Breckenridge, who was incarcerated for stealing, testified that he worked in Murtaugh's junkyard in 1994 and knew Steen at that time. He denied saying anything to Steen or anyone else about a van that Heidi may have been abducted in or where her remains were. He denied ever living on Rice Road.

Danielle Babcock used to work for Bohrer in 2001 and 2002 and testified that he would make comments that he would "do [her] like he did Heidi." Bohrer testified that he started scrapping vehicles at Murtaugh's junkyard prior to Heidi's abduction. He denied threatening Babcock.

The court denied the motion, and we granted defendant leave to appeal.

## Analysis

A court may vacate a judgment upon the ground that "[n]ew evidence has been discovered . . . which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g]). The defendant "must prove that there is newly discovered evidence: (1) which will probably change the result if a new trial is granted; (2) which was discovered since the trial; (3) which could not have been discovered prior to trial; (4) which is material; (5) which is not cumulative; and[ ] (6) which does not merely impeach or contradict the record evidence" (*People v Bryant*, 117 AD3d 1586, 1587 [2014] [internal quotation marks omitted]; *see People v Backus*, 129 AD3d 1621, 1623 [2015], *lv denied* 27 NY3d 991 [2016]). The determination of such a motion rests within the sound discretion of the hearing court (*see Backus*, 129 AD3d at 1623-1624; *Deacon*, 96 AD3d at 967; *People v Tankleff*, 49 AD3d 160, 178 [2007]).

In my opinion, defendant met his burden of establishing all six factors by a preponderance of the evidence, and I therefore conclude that the court abused its discretion in denying the motion (*see* CPL 440.30 [6]; *Tankleff*, 49 AD3d at 179-180). The only dispute in this case is the first element, i.e., whether the newly discovered evidence would probably change the result if a new trial was granted.

### A. Pierce's Testimony

Pierce was the only person who provided eyewitness testimony at the hearing, as opposed to providing hearsay evidence on statements made by Steen, Breckenridge, or Bohrer. The court concluded that Pierce's testimony was not credible and could not be the basis for a new trial. I disagree. An appellate

court, of course, may make its own credibility determinations (*see Tankleff*, 49 AD3d at 178-179), and I conclude that the court erred in rejecting Pierce's testimony as not credible. Unlike some of the other witnesses at the hearing, Pierce did not come forward after the renewed media coverage in 2014 to implicate Steen, Breckenridge, or Bohrer. Instead, he went to the police to report what he had seen on the day of Heidi's disappearance and to confirm that defendant was the person he saw and that they had the right man in custody. It was not until he saw a photograph of Steen in the newspaper over a week later that he realized he had made a mistake. At the hearing, he testified that Steen was the man he saw striking the woman.

The court found that Pierce was not credible because he was unable to identify Steen from a photograph that the police showed him. However, Steen was 23 years old at the time of Heidi's disappearance in 1994, and the police showed Pierce a photograph of Steen from 1988, when he was only 17 years old and without a beard. The court also found Pierce not credible because he testified that there was slush on the ground, but the photographs taken at the store showed only a partially wet road. Other witnesses at the trial, however, similarly testified that there was snow or slush on the road early that morning. Indeed, one of defendant's neighbors testified that he saw tire tracks in the snow/slush that was in defendant's driveway. The court also did not credit Pierce's testimony because he did not call the police to report what he saw, but the same could be said of Bivens, who waited five days before contacting the police because he also did not want to get involved. Pierce explained that he did not come forward at the time of defendant's trial because he believed that the police had the right person in custody. The court also suggested that Pierce's memory of the man he saw that morning was tainted by the photographs he had seen in the newspaper. While that may be true, the same could be said of the witnesses at trial regarding their identification of Richard's van, some of whom did not come forward until many months after the incident.

To be sure, some aspects of Pierce's description of the events he saw that morning were questionable, such as his testimony that the woman he saw had dark hair, when Heidi's hair was dirty blonde, and his testimony that the man he saw was 35 to 45 years old, when Steen was in fact only 23 years old at the time. However, there was no showing that his description of how the man otherwise looked, i.e., bearded and husky, was not consistent with how Steen appeared in 1994. In addition,

even setting aside Pierce's identification of Steen as the perpetrator, Pierce also testified that the white van he saw that morning was *not* Richard's van. This is noteworthy considering that the identification of Richard's van by Bivens at trial was not very convincing. When he first contacted the police, Bivens was unable to identify the van he saw that morning as Richard's van, and he actually told the police that it was not Richard's van. At trial, he testified that the stripe on the van caught his attention, yet he could not tell the police when he initially approached them whether the van had pinstripes. After the police gave him a night to think about it, Bivens then told the police that Richard's van was the one that he saw. He knew that because of the rust spot over the rear wheel and the trailer hitch. Pierce, however, described the white van that he saw that morning as having a lot of rust on the side. It stands to reason that the van that Bivens actually saw was the same van that Pierce saw, which was not Richard's van.

Fabian had identified Richard's van as the one she saw that came up very fast behind her and swerved back and forth. She told the police that the van was light blue, but Richard's van was white and black. In addition, the van remained behind her the entire time, and she saw only the front part of the van.

Bivens and Pierce were the only ones to witness Heidi's abduction. In several respects, their testimony was similar. Both described the man abducting Heidi as strong, husky, and with a beard, and both testified that she was placed in a white van with rust on the side. Bivens identified the van he saw as Richard's, but Pierce testified that it was not. This conflicting testimony, along with the absence of any forensic evidence tying defendant to the abduction and the absence of any eyewitness evidence identifying defendant as the perpetrator, leads me to conclude that Pierce's testimony would probably change the result of the trial (*see People v Bailey*, 144 AD3d 1562, 1564 [2016]).

B. Hearsay Evidence

With respect to the remaining evidence, the court concluded that the evidence would not be admissible at trial because it was hearsay not within any exception, and therefore defendant did not establish his entitlement to a new trial. I agree that "[i]mplicit in th[e] ground for vacating a judgment of conviction is that the newly discovered evidence be admissible" (*Backus*, 129 AD3d at 1624 [internal quotation marks omitted]). Indeed, without considering Pierce's testimony, that concept is critical to the resolution of this case. The People conceded at oral argument that, if all the evidence at the hearing was admissible ev-

idence, it may be enough to warrant a new trial. Contrary to the conclusion of the majority, I conclude that at least some of the third-party admissions would be admissible at trial as declarations against penal interest.

Out-of-court statements that are introduced to prove the truth of the matters they assert are hearsay, and are admissible only if they fall within a recognized exception to the hearsay rule (*see People v Brensic*, 70 NY2d 9, 14 [1987], *remittitur amended* 70 NY2d 722 [1987]). One such recognized exception is the declaration against penal interest. "This exception to the hearsay rule recognizes the general reliability of such statements, notwithstanding the absence of the declarant to testify, because normally people do not make statements damaging to themselves unless they are true" (*id.*). "A statement may be admitted as a declaration against penal interest where: the declarant is unavailable as a witness at trial; the declarant was aware the statement was against his or her penal interest when it was made; the declarant had competent knowledge of the facts underlying the statement; and 'supporting circumstances independent of the statement itself . . . attest to its trustworthiness and reliability' " (*People v DiPippo*, 27 NY3d 127, 136-137 [2016]; *see People v Ennis*, 11 NY3d 403, 412-413 [2008], *cert denied* 556 US 1240 [2009]; *Brensic*, 70 NY2d at 15). With respect to the final required element, i.e., the reliability of the statement, "there must be some evidence, independent of the declaration itself, which fairly tends to support the facts asserted therein" (*People v Settles*, 46 NY2d 154, 168 [1978]). Where, as here, the declarations exculpate the defendant, they are subject to a more lenient standard and are admissible "if the supportive evidence 'establishes a reasonable possibility that the statement might be true' " (*DiPippo*, 27 NY3d at 137; *see People v McFarland*, 108 AD3d 1121, 1122 [2013], *lv denied* 24 NY3d 1220 [2015]; *Deacon*, 96 AD3d at 968). "Whether a court believes the statement to be true is irrevelant" (*Settles*, 46 NY2d at 170). If there is a possibility of trustworthiness, "it is the function of the jury alone to determine whether the declaration is sufficient to create reasonable doubt of guilt" (*id.*).

Defendant submitted evidence at the hearing regarding statements made by Steen, Breckenridge, and Bohrer that he contends fall within the exception. All three of those witnesses testified at the hearing, thus seemingly showing that the first element cannot be met, but I conclude that this element is met where, as here, the witnesses testified but denied making the statements (*see People v Oxley*, 64 AD3d 1078, 1083-1084 [2009], *lv denied* 13 NY3d 941 [2010]).

In my opinion, the statements of at least Priest, Braley, and Combes would be admissible at trial. Priest stated that Steen told her in 2006 that he, Breckenridge, and Bohrer kidnapped Heidi by taking her from the store and placing her in Bohrer's white van. He further told her that they beat her up, took her into the woods to a cabin, cut her up, and placed her body under the floor. Braley testified that Steen said in 2006 or 2007 that he would never see a day in prison for what they did to Heidi, and Combes testified that in the early 2000's Breckenridge mentioned Heidi and said that they chopped her up, put her in a wood stove, put her in a vehicle, and sent her to Canada. These statements were against Steen's and Breckenridge's penal interests inasmuch as they admitted abducting and killing Heidi.

The court found that Priest was not credible because the cabin that was located on Rice Road was in thick brush in the woods, not near an open field, and it was not near railroad tracks and did not have a wood stove. There was, however, a cabin found off of Rice Road in the thick woods, and three different cadaver dogs alerted to the presence of human remains at that site, even though a forensic examination was unable to find anything of significance. The court also found that Braley's testimony was not trustworthy or reliable because she did not recite Steen's statements in the affidavit she gave to defense counsel in 2014. Braley lived with Wescott's parents in 2002 or 2003 and knew Wescott, Breckenridge, and Steen. Braley's affidavit stated in general that Steen and Breckenridge made admissions regarding a van being crushed at Murtaugh's that was then transported to Canada. Braley testified that she did tell defense counsel about Steen's specific statement, but it was not included in the affidavit. With respect to Combes, the court did not find him reliable because Combes himself did not believe Breckenridge and did not come forward until 2014. Combes worked with Breckenridge at the time he made his admission, and Combes testified that he did not report the admission to the police until the summer of 2014. He did not want to get involved, but he mentioned it to an officer who was a friend of his, who then had an investigator contact him. In determining the reliability of a declarant's statement, "[w]hether a court believes the statement to be true is irrevelant" (*Settles*, 46 NY2d at 170), and I similarly conclude that it is irrevelant whether Combes believed the statement to be true.

In determining the admissibility of a declaration against penal interest, "[t]he crucial inquiry focuses on the intrinsic

trustworthiness of the statement as confirmed by competent evidence independent of the declaration itself" (*id.* at 169). Contrary to the court's determination, I conclude that the supportive evidence establishes a reasonable possibility that these statements might be true (*see generally DiPippo*, 27 NY3d at 137).

Competent evidence independent of the declarations included the fact that witnesses testified that Heidi was abducted by men in a white van, Bohrer had a white van, and Steen, Breckenridge, and Bohrer worked for or did business with Murtaugh, and Steen hauled scrap for Murtaugh to Canada. Inasmuch as no eyewitnesses could place defendant at the store when Heidi was abducted, at the trial the People relied on testimony regarding the presence of Richard's van at the store, on Route 104, and at defendant's residence that morning. The evidence at the hearing now showed that there may have been another van at the store that morning. Priest said that she knew that Bohrer had a white van at the time of Heidi's disappearance. Pierce testified at the hearing that he saw a man strike a woman outside the store and place her into a white van, but it was not Richard's van. At the trial, Bivens and Fabian identified the van that they saw the morning of the incident as Richard's van, but Richard's van was also a white van, albeit with black doors and trim. Notably, Bivens told the police that he saw a van when he first reported the incident, but he was unable to identify Richard's van as the van that he saw until the third time that he was shown a photograph of the van. Fabian testified at trial that she saw a man pushing something down in the back of the van, which was presumably the abductor trying to control Heidi. A forensic examiner testified that such a struggle was likely to leave some transfer of material. However, despite extensive searching of Richard's van, the police never recovered any evidence that Heidi had been in that van. Priest stated that Steen told her that, after grabbing Heidi, they took off like a bat out of hell. The police found tire tracks at the store that looked as if someone left in a hurry, but those tire tracks did not match Richard's van. Steen told Priest that defendant was implicated only because his brother had a white van.

The court noted that none of the witnesses could credibly place Steen, Breckenridge, or Bohrer at the store on the morning of Heidi's disappearance, but the same is true regarding the evidence against defendant at his trial. There were only two eyewitnesses to Heidi's abduction (Bivens and Pierce), and neither one identified defendant as the perpetrator. The court

also noted that no witnesses testified that they saw Steen, Breckenridge, and Bohrer together around the time of Heidi's disappearance or that the men were more than just social acquaintances, but the evidence showed that all three worked for or did business with Murtaugh and were also connected with another man. Murtaugh owned a junkyard, and Steen testified that he hauled scrap for Murtaugh in 1994, sometimes to Canada. This provides an explanation as to how a van with Heidi's remains could end up salvaged in Canada, as stated by Breckenridge to Combes. In addition, although Priest had never mentioned Murtaugh's name or scrapping the van in her recorded conversation with Wescott, Wescott contacted Murtaugh before giving her statement to the police in 2013. Priest also stated that Steen told her that Heidi was killed because she was going to report a drug deal. This evidence showed a motive for Heidi's abduction, which was missing from defendant's trial, inasmuch as the evidence at the hearing showed that Heidi was an informant for the police and Steen and Breckenridge sold or used drugs at the time of Heidi's disappearance (*see McFarland*, 108 AD3d at 1122-1123). The statements of Steen and Breckenridge also provided an explanation for what happened to Heidi's body, i.e., it was buried underneath a cabin and/or placed in a van that was sent to Canada to be salvaged.

With respect to Wescott's recorded statement to Priest, I agree with the majority and the People that this constituted hearsay and did not technically fall within the exception of a declaration against penal interest because Wescott did not admit to being involved in Heidi's abduction. However, the Supreme Court has cautioned that, "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice" (*Chambers v Mississippi*, 410 US 284, 302 [1973]). I conclude that Wescott's recorded statement should be admissible because it " 'bore persuasive assurances of trustworthiness' and was critical to [defendant's] defense" (*Oxley*, 64 AD3d at 1084, quoting *Chambers*, 410 US at 302). Contrary to the majority, I found Wescott's admissions on that recording to make perfect sense. Wescott told the police that she simply lied to Priest, but she could have just told Priest that she knew nothing about Heidi's abduction when asked about it. Instead, Wescott told Priest that she dropped it from her mind 10 years ago, that it took her a while to do so, and that it bothered her to talk about it. She said that she was scared to tell anyone about it at the time it happened, and she would never report it now and "open a can of worms." She also offered the explana-

tion that Heidi was never brought inside the house, that they made her sit in the van. This statement was supported by Steen's statement to Priest that they placed Heidi in a van and brought her to Breckenridge's residence, where Wescott also lived. Wescott's admission that the police searched behind "Grandma Breckenridge's" house and that was why she and Breckenridge moved to Florida was also supported by Steen's statement to Priest to that same effect.

Further indicia of reliability of Wescott's statement was the evidence that, before giving a statement to the police after this phone call, Wescott texted Murtaugh even though his name was never mentioned by Priest. Wescott also admitted that Breckenridge reached out to her after she gave her first statement to the police and told her to keep her mouth shut about the case. The People note that, when Priest asked Wescott if she knew which one killed her, Wescott responded, "No idea. As far as I know Tibadeau [sic]." That was near the end of the conversation, however, after Wescott mentioned that defendant had been convicted, and Priest responded, "That's sad." Wescott shut down after that when Priest tried asking more questions about it, and gave curt responses or said that she did not want to talk about it because she did not "want that stuff back in [her] head."

As the majority notes, Wescott later recanted those admissions, but her supposed recantations changed during the police interview and at the hearing. Before she knew that the conversation had been recorded, Wescott told the police that she responded to Priest that she was crazy and asked what she was talking about when she brought up what Steen had told her. Before she knew that the recording had been monitored by the police, she claimed that Priest had tampered with the recording. Finally, she simply said that she told "a lot of lies" to Priest. Her deception continued at the hearing, where she gave absurd explanations for why she gave an alibi for Breckenridge when she supposedly did not know him, why she texted someone that she gave a false statement to the police, and why a friend was wrong when he claimed she texted him about not telling anyone that she went to Florida when Heidi went missing.

"When considering the reliability of a declaration, courts should . . . consider the circumstances of the statement, such as, among other things, the declarant's motive in making the statement—i.e., whether the declarant exculpated a loved one or inculpated someone else, the declarant's personality and mental state, and 'the internal consistency and coherence of

the declaration' " (*DiPippo*, 27 NY3d at 137). Here, Steen, Breckenridge, and Wescott were not related to defendant and were not his friends, and thus had no reason to exonerate him or implicate themselves or their friends in Heidi's disappearance. Wescott's statement to Priest revealed that she did not like discussing what happened to Heidi, and she showed fear and reluctance to speak to the police about it. The third-party admissions were made to people they knew, not strangers, and were made to provide explanations, rather than mere theories, to the listener as to what actually happened to Heidi. The majority notes that many of the third-party admissions were inconsistent with each other. At first blush, that seems to be the case inasmuch as the statements were that Heidi's body was cut up and buried in a cabin, or burned in a wood stove in the cabin, or placed in a van that was sent to Canada to be salvaged. It is certainly possible, however, that all three of those events could have occurred.

I therefore conclude that the testimony of Priest, Braley, and Combes, and the statement of Wescott, would be admissible at defendant's trial, and that evidence would probably change the result of the trial (*see Bailey*, 144 AD3d at 1564).

Finally, I believe a new trial should be granted based simply on the totality of the new evidence introduced at the hearing. There were numerous third-party admissions attributed to Steen, Breckenridge, and Bohrer. This is not a case where there was just one off-hand remark about Heidi's abduction, and I conclude that "[t]he sheer number of independent confessions provided additional corroboration for each" (*Chambers*, 410 US at 300). Many of the third-party admissions cross-corroborated the others. Many of the witnesses were unknown to each other, yet they gave similar testimony regarding declarations that were made to them. I therefore believe that a new trial should be granted. Present—Whalen, P.J., Centra, Peradotto and Scudder, JJ.